Tracy TICALI, Plaintiff,

v.

ROMAN CATHOLIC DIOCESE OF BROOKLYN, Saints Peter & Paul Church, E.D., and Teresa Chesnavage, Defendants.

No. 96–CV–4667 (ILG).

United States District Court, E.D. New York.

March 24, 1999.

John Houston Pope, Davis Weber & Edwards, New York City, for plaintiff.

Dominic Sarna, Wingate, Kearney & Cullen, Brooklyn, for defendants.

## MEMORANDUM & ORDER

GLASSER, District Judge.

Plaintiff Tracy Ticali ("Ticali") complains that she was discriminated against by her former employer, the Parochial School of Saints Peter and Paul Roman Catholic Parish (the "School"), because she was white, a lay catholic and a native-born non-Hispanic. She alleges that the School schemed to fire the white, lay teachers and replace them with Hispanic teachers, preferably Hispanic nuns from Argentina. In pursuit of this plan, the plaintiff asserts that the School harassed, demeaned and belittled her. The plaintiff further contends that when she complained about the treatment to the Equal Employment Opportunity Commission ("EEOC"), she was constructively discharged from her position in retaliation for the complaint.

### BACKGROUND

The parties do not dispute most of the facts underlying the plaintiff's various claims. However, each side vigorously contests the conclusions and inferences that may be drawn from these facts, which, accordingly, are set forth in some detail below.

From September 1993 through June 1996, the plaintiff was a first grade teacher at the School, which is operated by the defendant Saints Peter & Paul Parish, E.D. (the "Parish") and located in Brooklyn, New York. Ticali Jan. 1999 Decl. ¶ 2. The student body at the School is overwhelmingly Hispanic. *Id.* ¶ 3. Defendant Teresa Chesnavage ("Chesnavage"), a nun in the Society of the Sisters of the Church, was the assistant principal of the School during Ticali's first year there and became the principal shortly before the opening of the 1994–95 school year. *Id.* ¶ 5.

Ticali completed her first year of teaching (1993–94) without incident—in her words she "performed satisfactorily." *Id.* ¶ 4. During the 1994–95 school year, Ticali again received evaluations leading her to believe that her work was acceptable. For example, in February of 1995, Chesnavage observed Ticali teaching her class to read. Chesnavage reported favorably on that observation, writing, "Tracy has a wonderful rapport with her students .... Ms. Ticali has worked hard to develop techniques that help her students progress in reading and phonics." *Id.* at Ex. A.

Ticali worked at the School pursuant to successive one-year employment contracts. The contracts provided a non-renewal deadline—either party could elect not to renew the contract by communicating that election to the other party by April 15th. Toward the end of her second year, Ticali elected to renew, and, on April 30th, 1995, signed a contract for the 1995–96 school year. *Id.* ¶ 7.

In the Spring of 1995, at a teachers' meeting prior to the end of the school year, Chesnavage commented that nuns from Argentina were coming to the Parish and that some of them would be helping out at the School. Ticali did not regard this news as noteworthy at that time. *Id.* ¶ 8.

On June 20th, 1995, sometime after the above mentioned teachers' meeting, Chesnavage followed Ticali out of a staff meeting and into her classroom, and proceeded to "berate" her on a number of subjects. *Id.* ¶ 9. Chesnavage criticized Ticali for suggesting to a student's guardian that the student might benefit from repeating first grade. *Id.* Chesnavage also chastised Ticali for requiring a chaperon on a field trip and for being unprofessional. *Id.* Finally, Chesnavage called Ticali and a group of other white, non-Hispanic teachers "bochingchettas"—a Spanish term for gossipmongers. *Id.*

During the June 20th, 1995 conversation, Ticali said to Chesnavage "a remark to the effect that 'it's not like we want to get rid of you but we don't like the way you talk to us like we're children.'" *Id.* ¶ 10. Chesnavage subsequently typed Ticali's comment on a sheet of paper, and presented the typed comment to Ticali and the other teachers in the School for their signature. *Id.*

On June 22nd, 1995, Ticali went to see Monsignor Augustin Ruiz ("Ruiz"), the Pastor and Corporate Secretary of the Parish, to discuss the poor relationship she and other teachers had with Chesnavage. *Id.* ¶ 11. Ticali asked Ruiz to come to the School to mediate the problems that they were having. *Id.* Later that day, after considering the advice given to her by another teacher, Ticali returned to Ruiz and told him that she would try to settle things with Chesnavage without his assistance. *Id.*

On June 23rd, 1995, Chesnavage gave Ticali her regularly scheduled year end evaluation. *Id.* ¶ 12. During the evaluation, Chesnavage reprimanded Ticali for discussing their relationship difficulties with Ruiz and requested that Ticali resign and not teach the following year. *Id.* She informed Ticali that the School would not renew her contract for 1996–97 if she insisted on teaching during the 1995–96 school year and that a "paper trail" would be assembled against her. *Id.* However, Chesnavage promised Ticali a favorable reference if she were to voluntarily leave the school. *Id.* Although Ticali considered

her evaluation "satisfactory overall but highly unfavorable in several respects," *id.* ¶ 13, this Court characterizes the evaluation as a positive one, despite the few areas noted for improvement. *See id.,* Ex. B ("With more experience Tracy has the potential to become a very good primary grade teacher."). At the conclusion of the meeting, Ticali told Chesnavage that she would consider her request to resign. *Id.* ¶ 14.

Throughout July 1995, Chesnavage pressed Ticali to make a decision concerning her resignation by leaving telephone messages at her house and by sending her a certified letter requesting a meeting to discuss the matter. *Id.* ¶ 14, Ex. C. Sometime that month, Ticali learned that after the school year had ended Chesnavage had asked Cailin Healey, the kindergarten teacher, to resign. *Id.* On hearing the news about Cailin Healey, Ticali retained counsel because she "was now concerned that [Chesnavage] was trying to get Mrs. Healey and I to resign in order to open up positions for the nuns from Argentina." *Id.*

On August 18th, 1995, pursuant to a letter from Ticali's counsel to the Diocese's education office, a meeting was held between Ruiz, Chesnavage and Ticali. *Id.* ¶ 15. At that meeting, Chesnavage and Ruiz gave Ticali explicit assurances that she would be treated fairly during the coming year and that the decision whether to renew her contract at the end of the year would be done based on a "clean slate." *Id.*

Over the course of the 1995–96 school year, Chesnavage closely scrutinized Ticali and provided criticism of her work in the form of memoranda and evaluation conferences. *Id.* ¶ 16. Chesnavage observed Ticali teach a reading class on February 17th, 1996 and, on March 22nd, 1996, they discussed Chesnavage's observations. *Id.* ¶ 17. Ticali thought that Chesnavage's comments were "devastatingly unfavora-

ble," although the written report Chesnavage gave Ticali contained marks that were mostly in the "acceptable" to "good" range. *See id.,* Ex. F (The written report was a form that required the evaluator to indicate, on a scale, how the teacher performed in a number of areas, including "Classroom Routines," "Pupil–Teacher Relationships" and "Teaching Skills." The scale contained the following categories: "unsatisfactory," "needs improvement," "acceptable," "good," and "excellent.").

In the March 22nd, 1996 conference, Chesnavage told Ticali that she "did not have the 'know how' to teach 'these children' and that [she] should be teaching in a suburban area where there are no problems." *Id.* ¶ 17. Ticali now contends that the remarks "know how," "these children," and "suburban areas" were discriminatory and on April 11th, 1996 filed a discrimination charge with the EEOC against both the Parish and the Diocese.[1] *Id.* ¶¶ 18–19.

On April 18th, 1996, Chesnavage sent a memorandum to Ticali criticizing her for not testing the students enough. *Id.* ¶ 22, Ex. G. Ticali received additional memoranda criticizing her work on April 25th, May 21st and May 23rd, 1996. *See id.,* Exs. H, I & J. Chesnavage also verbally chastised Ticali during this period. *Id.* ¶ 24.

On April 19th, 1996, four days after the April 15th contract renewal deadline had elapsed, Ticali received a letter from Chesnavage informing her that her contract would not be renewed. *Id.* ¶ 21. In response, on May 19th, 1996, Ticali filed a "Retaliation Charge" with the EEOC against the Parish and the Diocese. On May 20th, 1996, through a letter from her attorney, Ticali protested the untimeliness of the School's termination letter and demanded that she receive a contract for the 1996–97 year. After discussing the situation with Ruiz, Chesnavage retracted the non-renewal letter and, on May 23rd, 1996, offered Ticali a position as the pre-kinder-

---

1. Although the EEOC charge does not list the Parish, Ticali claims that it was a typographical error and that the Parish should have been listed as a defendant.

garten teacher at the School for the 1996–97 term. Ticali did not accept this position nor did she accept it when it was again offered to her by letter on June 7th, 1996.

On June 21st, 1996 Ticali received notice of her "Right To Sue" from the EEOC and, on September 20th, 1996, filed this Complaint alleging multiple claims. She contends that the Diocese and the Parish engaged in unlawful employment practices and retaliation, in violation of §§ 703(a)(1) and 704 of Title VII, 42 U.S.C. §§ 2000e–2(a)(1) and 2000e–3 ("Title VII"), the Civil Rights Act of 1991 and New York Human Rights Law, N.Y. Exec. L. §§ 296 *et seq.*, by discriminating against her with respect to her employment because of her race, religion and national origin. In addition, the Complaint alleges that all the defendants interfered with Ticali's contract rights, in violation of 42 U.S.C. § 1981. Further, Ticali brings a claim of intentional infliction of emotional distress against all the defendants. Finally, Ticali alleges that the Diocese and the Parish breached their employment contract with her.

The defendants now move for summary judgment on all of the plaintiff's claims. Ticali cross-moves for summary judgment on her breach of contract claim. In a separate motion, the plaintiff requests that this Court strike various affidavits and exhibits and not consider them in its determination of the substantive motions. Each party has also moved to disqualify the counsel for the other side. These motions are now considered.

## DISCUSSION

### I. Summary Judgment

#### A. Legal Standard

Summary judgment under Rule 56 is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477

U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proof on such motion. *See United States v. All Funds,* 832 F.Supp. 542, 550–51 (E.D.N.Y.1993).

If the movant satisfies its initial burden of production, the burden of proof shifts to the nonmovant who must demonstrate that a genuine issue of fact exists for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a jury could return a verdict in its favor. *Id.* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admission on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Once the nonmovant has adduced evidence of a genuine issue of material fact, its "allegations [will be] taken as true, and [it] will receive the benefit of the doubt when [its] assertions conflict with those of the movant." *Samuels v. Mockry,* 77 F.3d 34, 36 (2d Cir.1996).

In employment discrimination cases, courts are particularly cautious about granting summary judgment where intent is at issue. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). However, even in these cases a "plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Id.*

#### B. Defendants' Failure to File Rule 56.1 Statements

As a preliminary matter, this Court notes that Local Civil Rule 56.1 ("Rule 56.1") of the Eastern District of New York requires the summary judgment movant to

submit a statement of material facts to which it contends there is no genuine issue to be tried, and requires the party opposing summary judgment to submit a controverting statement asserting that genuine issues of fact remain to be tried. Ticali submitted her Rule 56.1 statement along with her moving papers, but the defendants did not. Nor did they submit a controverting statement in opposition to Ticali's motion. She argues that since the defendants did not file a controverting Rule 56.1 statement, all material facts in Ticali's 56.1 statement must be deemed admitted by the defendants for purposes of her summary judgment motion. Further, Ticali argues that the defendants' failure to submit a Rule 56.1 statement in support of their own motion for summary judgment is a reason to deny their motion. Each of these contentions are now addressed.

Federal Rule of Civil Procedure 56(e) provides that when a motion for summary judgment is made and supported by affidavits and depositions, an adverse party's response "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate shall be entered against him." In this case, despite the defendants' failure to file a controverting Rule 56.1 statement, it is not appropriate to enter an order of summary judgment against them because the defendants have responded to the plaintiff's motion with affidavits showing that any contested issues of fact between the parties are not material. To the extent that there is some dispute between Ticali's Rule 56.1 statement and the defendants' papers, the facts will be viewed in the light most favorable to the plaintiff and any facts in Ticali's Rule 56.1 statement which remain uncontroverted by the defendants' papers will be

accepted as true. *See Dusanenko v. Maloney,* 726 F.2d 82, 84 (2d Cir.1984).

Turning to the defendants' motion for summary judgment, the court notes that, while it could deny their motion on the ground that they failed to comply with Local Rule 56.1, this Court is not compelled to do so but may overlook the "technical deficiency" of a party's submission. *Zeno v. Cropper,* 650 F.Supp. 138, 139 (S.D.N.Y.1986) (citing *Reisner v. General Motors Corp.,* 511 F.Supp. 1167, 1174–75 n. 14–15 (S.D.N.Y.1981), *aff'd,* 671 F.2d 91 (2d Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982)). Though the defendants indeed failed to submit a Rule 56.1 statement with their moving papers, their affidavits set forth clearly the few issues of fact that are disputed and will be deemed to satisfy the rule.

### C. *The Motion to Strike Various Affidavits and Exhibits*

In an additional procedural matter, the plaintiff requests that this Court strike certain materials that have been submitted either in support of defendants' motion for summary judgment or in opposition to plaintiff's motion for summary judgment. The only "material" aimed at which the Court will consider are the "Teachers' Affidavits" (made by teachers and staff who worked at the School during the relevant time period) attached as Exhibit 14 to the First Sarna Affidavit.[2]

Ticali correctly urges this Court to disregard those parts of the affidavits that are not based on personal knowledge as being inadmissible. Pl.'s Mem. in Supp. of Mot. to Strike at 5 (citing *United States v. Alessi,* 599 F.2d 513, 515 (2d Cir.1979)). In using the teacher's affidavits as evidence, this Court relies only on those portions based upon personal knowledge of the affiant.

---

**2.** Each party has also moved to disqualify the other's counsel. At oral argument these mo-

tions were withdrawn.

## II. The Breach of Contract Claim

Ticali's 1995–96 employment agreement stated that:

> If this contract is not to be renewed for the following year, namely, September 1, 1996 through August 31, 1997, written notice of intention to terminate employment must be given by the party desiring such termination not later than April 15, 1996.

Defs.' Mot., Ex. 9.

The School now concedes that it unintentionally breached its agreement with Ticali when, on April 19th, 1996, it communicated its intention not to renew her contract.[3] It is also undisputed by the parties that, after the School was notified by Ticali of its breach, it offered her a position teaching the pre-kindergarten class. Ticali claims that this offer failed to cure the breach. This argument is now addressed.

### A. Collateral Estoppel

■ As a threshold matter, Ticali claims that collateral estoppel precludes this Court from even considering the defendants' arguments on the breach of contract claim because an Administrative Law Judge ("ALJ") has already ruled on this issue in a hearing to reconsider the denial of Ticali's unemployment law benefits.

Collateral estoppel precludes a party from relitigating in a subsequent action an issue that was clearly raised in a prior action and decided against that party.[4] Foceri v. Allstate Ins. Co., 1999 WL 31128 (E.D.N.Y.1999); Ryan v. New York Telephone Co., 62 N.Y.2d 494, 500, 467 N.E.2d 487, 490, 478 N.Y.S.2d 823, 826 (1984). "Issues are considered identical if a different decision in the second suit would necessarily 'destroy or impair rights or interests established by the first.'" Application of American Tobacco Co., 880 F.2d 1520, 1527 (2d Cir.1989) (quoting Ryan, 62 N.Y.2d at 501, 478 N.Y.S.2d at 826, 467 N.E.2d at 490) (other citations omitted). "In the application of collateral estoppel with respect to administrative determinations, the burden rests upon the proponent of collateral estoppel to demonstrate" that the issues are identical. Ryan, 62 N.Y.2d at 501, 478 N.Y.S.2d at 826, 467 N.E.2d at 490.

In this case, after Ticali rejected the School's offer, she applied for unemployment benefits and was initially denied. On appeal before the New York State Unemployment Insurance Appeal Board to reconsider the denial, an ALJ held, in an opinion issued on December 4, 1996 ("ALJ Op."), that the plaintiff had "good cause" to leave her employment.

Ticali claims that collateral estoppel applies because the present issue is identical to the one that was before the ALJ. Her claim is flawed. In the unemployment benefits hearing, the issue was whether Ticali had "good cause" to voluntarily leave her employment. Here, by contrast, the issue is whether the defendants breached their contract with her. Ticali claims that this distinction is of no moment because the ALJ, in deciding that Ticali had "good cause," found that the School had breached the contract. However, Ticali misstates the ALJ's conclusion.

The ALJ found that the School's "attorney indicated to the claimant's attorney that the position being offered did not involve tenure, which she would have been entitled to had she been appointed again as a first grade teacher." ALJ Op. at 2.[5]

---

3. The School claims that the renewal date on the contract should have been April 30, 1996, but due to a printing error it was April 15, 1996. Ruiz. Aff. ¶ 19.

4. The Court notes that where, as here, the parties have had an adequate opportunity to litigate before a state agency, it must give the ALJ's fact finding the same preclusive effect to which it would be entitled in the State's courts. See Romano v. Thunder Projects, Inc., 696 F.Supp. 831, 833 (N.D.N.Y.1988).

5. The relevant portion of the ALJ's opinion reads as follows: "The claimant chose not to enter into a contract for work for the next school year as a pre-kindergarten teacher and to pursue litigation against her employer be-

However, it is clear that the School's attorney was drawing a semantic distinction between "tenure," which was not offered to any teachers at the school, and "job stability," a term of art defined in the School's Teacher's Handbook and offered to teachers at the beginning of their fourth year of employment with the school.[6] But, because Ticali believed, on the basis of discussing the matter with her attorney, that she would not be given "tenure," the ALJ found that "[u]nder these circumstances, [Ticali] had good cause to voluntarily leave her employment for purposes of the Unemployment Insurance Law." *Id.* at 3. The ALJ's decision was based on Ticali's subjective belief, and not on an objective consideration of the law of contracts; he neither examined nor determined whether the School actually breached its contract with Ticali.

Resolution of the contract issue now before this Court is not "identical" to the issue decided by the ALJ because a judgment here will not "destroy or impair the rights" conferred on Ticali by the ALJ's decision. *See, e.g., Ryan* at 490. This Court can hold that the School honored its contract with Ticali, yet also find that she had "good cause" to leave her position based on her subjective belief. Accordingly, this Court concludes that collateral estoppel does not prevent the defendants from asserting that their offer to Ticali to teach pre-kindergarten was an effective cure of their breach.

## B. *The Pre–Kindergarten Offer*

As previously stated, Ticali's 1995–96 contract had an automatic renewal provision, which required each party to give "notice of intent to terminate employment ... not later than April 15, 1996." *See L. Orlik Ltd. v. Helme Products Inc.*, 427 F.Supp. 771, 774 (S.D.N.Y.1977) (holding that where contract is "renewable" and gives mechanism for termination but not for renewal, "contract is automatically renewable unless one of the parties takes the specific action of terminating it in conformity with the specific notice requirements"). Because notice of non-renewal was not given by the prescribed date, the contract automatically renewed itself on April 15th, 1996. Therefore, Chesnavage's letter of April 19th, 1996 was a repudiation of the contract prior to the start of performance. *See generally* E. Allan Farnsworth, *Contracts* § 8.21, at 662–663 (2d ed.1990).

When an injured party insists that a repudiating party perform and the repudiating party retracts its repudiation, the contract remains in force. *Id.* § 8.22, at 669; *see also Argonaut Partnership v. Sidek*, 1996 WL 617335, at * 6 (S.D.N.Y. 1996) ("If the repudiating party retracts its repudiation, the non-repudiating party once again becomes obligated to perform its obligations under the contract."). The Uniform Commercial Code's position is in accord with the common law. It provides that a repudiation of a contract can be retracted "unless the aggrieved party has since the repudiation canceled or materially changed his position or otherwise indicated that he considers the repudiation final." U.C.C. § 2–611(1) (1993).

Here, it is clear that Ticali neither changed her position nor considered the repudiation final, given the May 20th letter from her attorney protesting the untimeliness of her termination and demanding

---

cause of the non-renewal of her contract as a first grade teacher because it was indicated by the attorney for the employer in a conversation with her attorney that she would not be given tenure if she accepted the position as a pre-kindergarten teacher. The testimony of the claimant's attorney that the employer's attorney told him that the claimant would not be given tenure if she accepted the position as a pre-kindergarten teacher is accepted as more credible than the testimony of the employer's attorney that he made no mention of tenure to him. Under these circumstances, the claimant had good cause to voluntarily leave her employment for the purposes of the Unemployment Insurance Law." ALJ Op. at 2–3.

6. "Job Stability" is defined further and discussed in Section II, B, *infra*.

that she receive a contract for the 1996–97 year. Thereafter, in response to Ticali's demand, Chesnavage retracted the repudiation by offering to enter into an employment contract with the plaintiff for the subsequent year. However, Ticali claims that the retraction failed to cure the breach of contract because "the offer made by defendants to teach Pre–K in 1996–97[was] an inferior contract in three ways." Ticali Jan. 1999 Decl. ¶ 26. Ticali's arguments are addressed *seriatim.*

First, Ticali avers that the new offer did not confer "job stability," which she would have been entitled to had she been offered a contract to teach the first grade. Ticali is mistaken. The Teacher Personnel Handbook, which was incorporated by reference into Ticali's contract, defines "job stability" as follows:

> Every teacher who is properly qualified for regular and permanent, part-time employment on the *elementary* level and who begins a fourth consecutive year of teaching as of September 1 in the same school will be granted Job Stability at that school, effective on the September first date. Job Stability is the assurance of continued employment so long as services remain satisfactory.

Defs.' Mot., Ex. 11 at 23. (emphasis added). The "elementary level" is defined as "grades pre-K through 6." *Id.* Nowhere in the Handbook nor in Ticali's contract does it state that teaching the same grade is a prerequisite to achieving "job stability." Nor does Ticali's contract provide assurances of teaching the same grade from one year to the next—grade level assignments are "a matter of administrative discretion." *Id.* at 18. A plain reading of the contract in conjunction with the Teacher Personnel Handbook drives the Court to the conclusion that Ticali would have been entitled to "job stability" if she accepted the position as pre-kindergarten teacher and began to teach that class in September so long as her services remained satisfactory.

Second, Ticali argues that the pre-kindergarten position, unlike the first grade assignment, was not guaranteed employment and that had she accepted the position the school could have fired her under the pretense of inadequate enrollment. Ticali Jan. 1999 Decl. ¶ 26. However, it is hornbook law that "mere doubts by one party that the other party will perform when performance is due will not excuse the first party from performing." Farnsworth at § 8.23. In this case, Ticali's fear that the pre-kindergarten class might not have sufficient enrollment did not entitle her to decline the position and sue for breach of contract. *See id.* Further, there is no evidence that the School's offer was not made in good faith nor is there anything in the record suggesting that the School planned to cancel the pre-kindergarten class. In fact, the Court notes that one of the reasons that the Argentinean nuns were asked to help in the School was the increase in enrollment in the grammar school, prior to the 1995–96 school year, particularly at the pre-kindergarten level. *See* Ruiz Aff. ¶ 14; Chesnavage Aff. ¶ 12. If Ticali had doubts about the School's ability or intent to perform, she could have demanded an assurance of performance. *See* Restatement Contracts (Second) § 251 ("where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach ..., the obligee may demand adequate assurance of due performance ....").

Finally, Ticali asserts that teaching pre-kindergarten is "not the same as teaching a higher grade level, such as the first grade." Ticali Jan. 1999 Decl. ¶ 26. She claims that she was demeaned by such an offer because, in the past, a parent volunteer had handled some of the classroom responsibilities for the pre-kindergarten class. Ticali's conclusory opinion that the pre-kindergarten position was "considered by defendants to be an assignment used to punish teachers," is unsupported by any

evidence and refuted by Chesnavage.[7] "Such sweeping allegations unsupported by admissible evidence do not raise a genuine issue of material fact." *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 65 (2d Cir.1997).

Although, Ticali may have believed that the offer to teach the pre-kindergarten class was an undesirable one and hence an ineffective cure of the repudiation of the contract, the objective facts demonstrate otherwise. The offer conferred job stability, was in her area of expertise (pre-kindergarten through grade six), and was on the same terms as specified in her contract. As such, this Court finds that the offer effectively retracted the defendant's earlier repudiation of the contract. Accordingly, the plaintiff's motion for summary judgment on this claim is denied, defendants' motion on this claim is granted and Ticali's breach of contract claim is dismissed.

## III. *Title VII*

■ Initially, the defendants argue that this Court lacks subject matter jurisdiction over Ticali's Title VII claim on constitutional grounds. Although Title VII prohibits employers from discriminating on the basis of religion, the defendants argue that application of the prohibition to their employment decisions would be constitutionally suspect because it would violate both the free exercise clause and the establishment clause of the first amendment.[8]

Relying on the free exercise clause, courts have consistently found that Title VII does not apply to the relationship between ministers and the religious organizations that employ them, even where discrimination is not based on religion. *Little v. Wuerl*, 929 F.2d 944, 947 (3d Cir.1991); *Rayburn v. General Conference of Sev-*

*enth–day Adventists*, 772 F.2d 1164 (4th Cir.1985); *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972). However, Title VII has been interpreted to bar discrimination on non-religious grounds by religious organizations toward their non-minister employees. *Little*, 929 F.2d at 947. The key inquiry for a court seeking to apply Title VII to such an employment relationship is whether the position involved has any religious significance. If it does, courts have found that applying Title VII in such a situation is constitutionally suspect, if not forbidden. *Id.; Equal Employment Opportunity Commission v. Mississippi College*, 626 F.2d 477 (5th Cir.1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981); *Maguire v. Marquette University*, 627 F.Supp. 1499 (E.D.Wis.1986), *aff'd in part, vacated in part*, 814 F.2d 1213 (7th Cir.1987); *Feldstein v. Christian Science Monitor*, 555 F.Supp. 974 (D.Mass.1983).

The Catholic Church attaches religious significance both to its parochial schools and to the teachers that work there. *See Little*, 929 F.2d at 948 (citing National Conference of Catholic Bishops (1972), Appendix at 138). This significance has been recognized by the courts. *Id.; see also N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 501, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) ("In recent decisions involving aid to parochial schools we have recognized the critical and unique role of the teacher in fulfilling the mission of a church-operated school."); *Meek v. Pittenger*, 421 U.S. 349, 370, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) ("Whether the subject is 'remedial reading,' 'advanced reading,' or simply 'reading,' a teacher remains a teacher, and the danger that religious doctrine will become intertwined with secular

---

7. A more detailed analysis of Ticali's opinion that the offer to teach pre-kindergarten was an "inferior contract" is contained in this Court's discussion of her Retaliation claim, *infra* Section IV.

8. The first amendment to the Constitution provides in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; ..."

instruction persists."). Here, the facts compel this Court to conclude that it is precluded from considering Ticali's Title VII claim to the extent that it alleges religious discrimination. Despite the fact that Ticali is a non-minster, her role as a teacher in the school may be said to have religious significance, which deprives this Court of jurisdiction over her Title VII claim to the extent it alleges religious discrimination.

■ The defendants argue that because Ticali has alleged religious discrimination and because this Court has no jurisdiction over that aspect of her Title VII claim, the entire claim must be dismissed. *See* Defs.' Mem. at 11. The defendants are mistaken. The Federal Rules of Civil Procedure expressly permit a plaintiff to plead "two or more statements of a claim, even within the same count, regardless of consistency." *Henry v. Daytop Village, Inc.,* 42 F.3d 89, 95 (2d Cir.1994); Fed.R.Civ.P. 8(e)(2). Here, Ticali has pled religious discrimination, racial discrimination and national origin discrimination. Because this Court lacks jurisdiction only with respect to the aspect of her claim that pled religious discrimination, the Court now turns to the surviving elements of Ticali's Title VII claim.

### A. Legal Standard

In a standard Title VII case, the plaintiff must first establish a *prima facie* case of unlawful discrimination by showing that (1) he or she is a member of a protected class (2) who was qualified for his or her position (3) who suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Shumway,* 118 F.3d at 63. Second, if the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises and the burden then "shifts" to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Stratton v.*

*Dep't for the Aging for the City of New York,* 132 F.3d 869, 879 (2d Cir.1997); *Fisher v. Vassar College,* 114 F.3d 1332, 1335–36 (2d Cir.1997). Third, if the defendant articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The plaintiff must then show that the defendant's non-discriminatory reason is a pretext for unlawful discrimination. *See Fisher,* 114 F.3d at 1337.

### B. Reverse Discrimination

As a white woman, Ticali is not a member of a protected class for purposes of a Title VII claim that alleges racial discrimination. *See, e.g., Umansky v. Masterpiece Intern. Ltd.,* 1998 WL 433779 (S.D.N.Y. 1998). Therefore, the conduct complained of here must be examined under a "reverse discrimination" rubric. *See, e.g., Eastridge v. Rhode Island College,* 996 F.Supp. 161, 166 (D.R.I.1998). Many courts have recognized that requiring a "reverse discrimination" plaintiff to establish a *prima facie* case in strict accordance with *McDonnell Douglas* "would virtually preclude such plaintiff from bringing a Title VII discrimination claim." *Id.; see also; Notari v. Denver Water Dep't,* 971 F.2d 585 (10th Cir.1992); *Livingston v. Roadway Exp., Inc.,* 802 F.2d 1250 (10th Cir.1986); *Murray v. Thistledown Racing Club, Inc.,* 770 F.2d 63 (6th Cir.1985); *Parker v. Baltimore & Ohio R.R. Co.,* 652 F.2d 1012 (D.C.Cir.1981); *Bellairs v. Coors Brewing Co.,* 907 F.Supp. 1448 (D.Colo.1995).

Accordingly, in order to avoid the almost impossible hurdle that a "reverse discrimination" plaintiff faces under the *McDonnell Douglas* analysis, some courts have substituted a different framework for evaluating a "reverse discrimination" claim. *See, e.g., Olenick v. New York Telephone/A NYNEX Co.,* 881 F.Supp. 113, 114 (S.D.N.Y.1995) (holding "that a plaintiff

alleging 'reverse discrimination' may rely on the *McDonnell Douglas* criteria to 'prove a prima facie case of intentional disparate treatment when background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.'") (citing *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d at 1017); *see also Mills v. Health Care Service Corp.*, 171 F.3d 450 (7th Cir. 1999) (holding that plaintiff in reverse discrimination case must show some "background circumstances" to sustain claim); *Comiskey v. Automotive Industry Action Group*, 40 F.Supp.2d 877 (E.D.Mich.1999) ("[T]he Sixth Circuit has adopted a test which adds an additional element to the *McDonnell Douglas* paradigm in cases . . . involving claims of 'reverse' . . . discrimination.").

There is, however, disagreement among courts concerning the validity of this approach in light of the Supreme Court's seemingly clear instruction that Title VII "proscribe[s] racial discrimination . . . against whites on the same terms as racial discrimination against nonwhites." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Compare, e.g., *Umansky v. Masterpiece Int'l Ltd.*, 1998 WL 433779 (S.D.N.Y.1998) (applying *Olenick* ) with *Cunliffe v. Sikorsky Aircraft Corp.*, 9 F.Supp.2d 125 (D.Conn.1998) (rejecting *Olenick* ). A brief survey of courts outside this Circuit reveals the same confusion. Compare, e.g., *Parker*, 652 ·F.2d 1012 (D.C.Cir.1981) (higher *prima facie* burden for reverse discrimination plaintiff) with *Lucas v. Dole*, 835 F.2d 532 (4th Cir.1987) (no higher *prima facie* burden). The Second Circuit has not yet resolved this issue. In a closely reasoned opinion, which this Court finds persuasive, Judge Motley held that, "[a]bsent binding authority to the contrary, this court must assume that *McDonald* means what it says: a Title VII case is a Title VII case on the 'same terms'

for plaintiffs of all races." *Cully v. Milliman & Robertson, Inc.*, 20 F.Supp.2d 636, 641 (S.D.N.Y.1998).

Instead of the modified *McDonnell Douglas* formulation adopted by some circuits, this Court chooses to follow the Supreme Court's advice in *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) and will look to: ·

> whether or not an inference can be drawn from the established facts that the employer here treated plaintiff less favorably because of his race in the particular case. As one court has stated, in deciding such cases, the fact finder must keep in mind that "an employer may refuse to hire an employee for good reasons, bad reasons, reasons based on erroneous facts, or for no reason at all, so long as its actions are not based on discriminatory purposes." *Lewis–Webb v. Qualico Steel Co.*, 929 F.Supp. 385, 391 (M.D.Ala.1996).

*Eastridge*, 996 F.Supp. at 167; *see also* Denny Chin & Jodi Golinsky, *Moving Beyond McDonnell Douglas: A Simplified Method for Assessing Evidence in Discrimination Cases*, 64 Brook. L.Rev. 659 (Summer 1998) (calling for the abandonment of the *McDonnell Douglas* test and suggesting simplified approach to weighing and evaluating evidence of discrimination).

■ In a recent discussion of how a plaintiff in "reverse discrimination" Title VII case can show discrimination, the Seventh Circuit held that such a plaintiff must either show direct evidence of discrimination or at least one of a number of "background circumstances" such as a finding that the person ultimately hired was clearly less qualified than the plaintiff, the hiring authority expressed intense interest in hiring a member of a certain class, or that there was a pattern of uniform hiring in the past.[9] *Mills*, 171 F.3d 450, 456–57. An

---

9. Other "background circumstances" that may be sufficient to show "reverse discrimination" include "evidence indicating that the

particular employer at issue has some reason or inclination to discriminate against" the non-minority class, "evidence indicating that

examination of those facts, which Ticali claims are evidence of the defendants' discriminatory animus towards her, reveals neither direct evidence nor background circumstances which would permit an inference to be drawn that the defendants treated Ticali less favorably because of her race.

## C. *Application to the Present Case*

█ Ticali first points to Chesnavage's remark that Ticali did not have the "know how" to teach "these children" as direct evidence of discrimination. While it is true that the use of "code words" can violate Title VII, *see, e.g., Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1083 (3d Cir.1996), this Court cannot fathom how the cited words can be construed as direct evidence of discriminatory intent towards Ticali. On its face, it is plainly an administrator's assessment of an employee's strengths and nothing more. If anything, the phrase "these children" would be indicative of discrimination against the students and not Ticali. Further, Ticali concedes that at the time she thought Chesnavage used the phrase "these children" to refer to the fact that the School's students were economically disadvantaged. *See* Ticali Dep. at 616–17.

Next, the Court reviews Ticali's allegation that Chesnavage wanted to "match" the teaching population ethnically to the student body, which was ninety-nine per cent Hispanic. Pl.'s Opp'n at 2. As circumstantial evidence of this motive, Ticali claims that she began to receive negative evaluations shortly after Chesnavage learned that the nuns were coming to the Parish. *Id.* at 4. In response to Ticali's allegation, the defendants state that the nuns came to help the Parish in its religious ministry, Chesnavage Aff. ¶ 11, Ex. 15; Sister Mary Aff. ¶¶ 6, 8–9; Ruiz Aff. ¶ 11, and that there was no plan to replace

the white teachers with the nuns. *Id.* ¶ 13; Ex. 14, O'Donovan Aff. ¶ 9, Ruiz Aff. ¶ 11. As further evidence of this fact, they point out that only one of the nuns was qualified to teach in the School, Chesnavage Aff. ¶ 13, and that no teacher at the School ever lost his or her position to a nun from Argentina. Ex. 14, O'Donovan Aff. ¶ 9, Ruiz Aff. ¶ 15.

This Court also notes that the racial make-up of the teaching staff both before and after the Argentinean nuns came to the Parish fails to reflect any discriminatory pattern. Although four of the five teachers who left the School after the 1995–96 year were white and non-Hispanic, the five teachers were replaced by three white non-Hispanic teachers, one black non-Hispanic teacher and one of the Argentinean nuns. *Id.* ¶ 12. In addition, the teacher that replaced Ticali at her first grade position was a black woman from Grenada and not a member of any of the classes (Hispanic, Argentinean, cleric) allegedly favored by the defendants. While there is no per se rule that a plaintiff in a discrimination case must demonstrate that she was replaced by a person outside the protected class, *see Meiri v. Dacon,* 759 F.2d 989, 995–96 (2d Cir.1985), nonetheless, the fact that Ticali was not replaced by a Hispanic weighs heavily against an inference that she was discriminated against because of her race. *Umansky,* 1998 WL 433779, at *3; *see also Estepa v. Shad,* 652 F.Supp. 567, 571 n. 5 (E.D.N.Y. 1987) ("[U]nless a Title VII plaintiff is replaced by a member of a nonprotected class, proof of intentional discrimination appears extremely difficult, if not practically impossible."). Discrimination in the air, so to speak, will not do. *See Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir. 1998).

there is something 'fishy' about the facts of the case at hand," *Mills,* 171 F.3d 450, at 454–55 (citing *Harding v. Gray,* 9 F.3d 150, 153 (D.C.Cir.1993)), or evidence that the plaintiff was the only non-minority member of

a department where all the decision makers were minorities. *Mills* at 454–55 (citing *Reynolds v. School Dist. No. 1. Denver Colorado,* 69 F.3d 1523, 1534 (10th Cir.1995)).

Ticali also claims that Chesnavage harassed her in a discriminatory fashion, and points to the "bochingchetta" comment as evidence. The relationship between being called a "gossipmonger" in Spanish and discrimination is elusive indeed. Even assuming that a fact finder could find the comment disparaging, it is not actionable. It is well settled that Title VII is not, and was not designed to be, a civility statute. *See Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir.), *cert. denied*, ⸺ U.S. ⸺, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) ("utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII") (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (other internal quotations omitted); *Snell v. Suffolk County*, 782 F.2d 1094, 1102 (2d Cir.1986) (stating that a few isolated incidents of racial enmity do not give rise to a Title VII violation); *Abidekun v. New York City Transit Authority*, 1998 WL 296372 (E.D.N.Y.1998) (same). The record demonstrates that Ticali and Chesnavage did not have an amicable working relationship and, in fact, were openly feuding. However, there is no evidence that their dispute was driven by a discriminatory animus. Indeed, Ticali has conceded that both Hispanic and non-Hispanic teachers had difficulties with Chesnavage. Ticali Dep. at 543–51; *see also* O'Donovan Aff. ¶ 10; Ferreira Aff. ¶ 5; Guzman Aff. ¶ 9.

Finally, Ticali points to the fact that she received favorable evaluations until the School had the opportunity to replace her with a Hispanic nun as evidence of Chesnavage's discriminatory intent. In response to this, *Moorer v. Grumman Aerospace Corp.*, 964 F.Supp. 665, 674 (E.D.N.Y.1997) is instructive:

> An employee's opinion that a performance review was unfair, supported only by her own conclusory statements to that effect, cannot bootstrap her claims

into a Title VII claim of discrimination. Nor can prior good evaluations of the plaintiff's work performance alone establish that later unsatisfactory evaluations are pretext for unlawful discrimination.

(internal quotations and citations omitted).

Chesnavage may have harassed, insulted and criticized Ticali, but Title VII does not make employers liable for being mean or petty; it makes them liable for discriminating, for firing people or subjecting them to adverse employment determinations on account of their being a member of a protected class. *See, e.g., Norton v. Sam's Club*, 145 F.3d at 120. The record in this case is devoid of evidence, direct or circumstantial, sufficient to support a finding that Ticali was assigned to teach a different class because of her religion, race or national origin. And absent a triable issue of fact on this point, summary judgment for the defendants is warranted.

## IV. *Retaliation*

Title VII forbids an employer to retaliate against an employee for engaging in protected activity. *See* 42 U.S.C. § 2000e–3(a). Retaliation claims under Title VII are tested under a three-step burden shifting analysis. *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998). First, the plaintiff must make out a *prima facie* case of retaliation. *Id.* Second, the defendant then has the burden of articulating a legitimate non-retaliatory reason for the complained of action. *Id.* Third, if the defendant meets its burden, plaintiff must adduce evidence sufficient to raise a fact issue at to whether the employer's reason was merely a pretext for retaliation. *Id.*

To establish a *prima facie* claim for retaliation, Ticali needs to show that she (i) participated in a protected activity known to the defendants; (ii) suffered an adverse employment action; and (iii) that there is a causal connection between the protected activity and the adverse employment action. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995). Here, Ticali is

unable to make out a *prima facie* claim for retaliation because she cannot show that she suffered an adverse employment action or that she was retaliated against.

Ticali avers that she suffered an adverse employment action when she was terminated on April 19th, 1996, *see* Pl.'s Mem. Opp'n at 13, however, as discussed in Section II, B, *supra,* the termination was retracted. Therefore, Ticali cannot rely on her termination to satisfy an essential element of her *prima facie* case. In response to Ticali's argument that the notice of termination was given within days after the EEOC Complaint was filed, the undisputed facts demonstrate that on June 23rd, 1995, Ticali was requested to resign—a request that she considered. This was long before she filed her EEOC claim on April 15th, 1996 and long before she was told she was terminated on April 19th, 1996.

Ticali considered the School's attempt to transfer her to the pre-kindergarten class a demotion. *See* Ticali Jan. 1999 Decl. ¶ 26. Although the parties did not brief the point, the Court now considers whether this transfer is an adverse employment action for the purposes of the plaintiff's Title VII claim.

To establish that an employment action is adverse under Title VII, a plaintiff must show that the conduct complained of materially affected the terms and conditions of employment. *Torres v. Pisano,* 116 F.3d at 640. However, "Congress did not define adverse employment action solely in terms of job termination or reduced wages and benefits...." *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir. 1997). "But the mere fact that an employee has been transferred or that his job responsibilities have changed is not sufficient in itself to show an adverse change in working conditions." *Cooper v. New York State Dep't of Human Rights,* 986 F.Supp. 825, 828 (S.D.N.Y.1997). In short, "[b]ecause there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action

reaches the level of 'adverse.'" *Wanamaker,* 108 F.3d at 466.

Here, the plaintiff contends that a transfer from teaching first grade to teaching pre-kindergarten is a material change in the terms of her contract. Specifically, she alleges that teaching pre-kindergarten is "not the same" as teaching a higher grade because she enjoyed "teaching children reading, mathematics and other subjects that simply are not taught to Pre–K children ...." Ticali Jan. 1999 Decl. ¶ 26. A preference for one position over another, however, is not sufficient to show an adverse change in working conditions. *See Armfield v. Jacobson,* 1998 WL 427560 (E.D.N.Y.1998) (adverse action not found where plaintiff had subjective preference for one position over the other); *Garber v. New York City Police Dep't,* 1997 WL 525396, *7 (S.D.N.Y.1997) ("Plaintiff's dissatisfaction with the transfer, standing alone, does not support his claim of an adverse employment action.").

Further, the defendants contradict Ticali's claim that the pre-kindergarten position represented a demotion and point to the fact that Adela Guzman, a Hispanic woman, for whom the defendants allegedly had a preference, was transferred from teaching the fifth grade to teach the pre-kindergarten class when Ticali declined the position for the 1996–97 school year. Chesnavage Supplementary Aff. ¶ 14.

It is axiomatic that students cannot succeed in subsequent grade levels without first mastering the curriculum of the earlier grades. Pre-kindergarten students have important, if not sophisticated, lessons to learn. For example, if students do not learn the alphabet they cannot begin to learn to read. Similarly, pre-kindergarten pupils must learn to recognize numbers in order to begin rudimentary arithmetic. In addition, there are a host of other lessons, including cooperation and basic learning skills that pre-kindergarten students must learn to appreciate, which form the building blocks of their future studies. *See*

*generally* Martha I. Morgan, Adam S. Cohen, Helen Hershkoff, *Establishing Education Program Inadequacy: The Alabama Example,* 28 U. Mich. J.L. Ref. 559, 576 (1995) (noting that research on pre-kindergarten programs has found a positive effect on the language and cognitive measures of disadvantaged children that improves their chances of high school graduation).

Despite Ticali's disdain for the pre-kindergarten position, she has provided no material evidence that her transfer obliged her to perform tasks that were less appropriate for her skills than her prior position or adverse to her in any other legally cognizable way. *See, e.g., Cooper,* 986 F.Supp. at 828. The evidence in this case drives this Court to conclude that Ticali's transfer was a purely lateral transfer, which cannot sustain her position that it was an "adverse employment action." *See Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996) ("Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do either.") (collecting cases); *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir.1993) (employee's transfer to position with similar salary and benefits was not materially adverse change in employment); *cf. Rodriguez v. Board of Ed.,* 620 F.2d 362 (2d Cir.1980) (finding adverse employment action where art teacher was transferred from junior high school to elementary school, obviating twenty years of teaching experience and her doctoral degree in art education); *Copeland v. Rosen, et al.,* 96 CV 6308 (S.D.N.Y. March 9, 1999) (Leisure, J.) (finding adverse employment action where teacher was transferred to position at another school).

Because Ticali cannot show that she suffered an adverse employment action, she cannot make out a *prima facie* case of retaliation and that claim is dismissed.

## V. *Section 1981*

The fifth count of Ticali's Complaint alleges that the defendants interfered with her making and enforcing of contracts in violation of 42 U.S.C. § 1981, by attempting to induce her to terminate her 1995–96 contract, by harassing her during the performance of that contract, and by refusing to renew her contract for 1996–97 on the terms to which she was entitled, based on her race. Compl. ¶ 50.

Section 1981 provides, in relevant part, "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts, ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by *white citizens* ..." 42 U.S.C. § 1981 (emphasis added). In general, the first requirement for maintaining a § 1981 claim is that the plaintiff be a member of a racial minority. *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993); *Pisello v. Town of Brookhaven,* 933 F.Supp. 202, 215 (E.D.N.Y.1996). *But see Davis v. Halpern,* 768 F.Supp. 968, 983 (E.D.N.Y.1991) (§ 1981 supports claim of reverse discrimination brought by white student).

A non-minority plaintiff may only bring a § 1981 action under limited circumstances. *Albert v. Carovano,* 851 F.2d 561, 572–73 (2d Cir.1988). The threshold showing that any non-minority plaintiff proceeding under § 1981 must make is that she suffered an injury due to discrimination against a protected minority class. *See Sullivan v. Little Hunting Park Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). Accordingly, a white plaintiff may bring a § 1981 claim if she was the direct target of the defendant's discriminatory action, but only if that action was motivated by animosity towards the race of a third party who is a member of a racial minority group. *See Benjamin v. Aroostook Medi-*

*cal Ctr., Inc.,* 57 F.3d 101, 105 (1st Cir. 1995); *Carovano,* 851 F.2d at 572–73 (holding that non-minority plaintiffs must identify with some particularity the nature of the Section 1981 rights being vindicated); *cf. Alizadeh v. Safeway Stores, Inc.,* 802 F.2d 111, 114 (5th Cir.1986) (allowing § 1981 suit by white female alleging that she was discharged because her husband was Iranian); *Parr v. Woodmen of the World Life Ins. Co.,* 791 F.2d 888, 890 (11th Cir.1986) (white male alleging he was not hired because his wife was black); *DeMatteis v. Eastman Kodak Co.,* 511 F.2d 306 (2d Cir.), *modified on other grounds,* 520 F.2d 409 (1975) (white person alleging he was forced into retirement because he had sold his house to black person); *Des Vergnes v. Seekonk Water Dist.,* 601 F.2d 9, 14 (1st Cir.1979) (non-minority real estate developer had standing where defendant's alleged discriminatory action was motivated by animosity towards the race of the developer's prospective tenants and not his race); *Pisello,* 933 F.Supp. at 215 (non-minority plaintiff has § 1981 standing where he is retaliated against as a result of his failure to discriminate in the contractual context).

In this case, Ticali alleges that her contractual rights were abridged because she was white. She does not make any claims that the defendants' actions were motivated by any discriminatory animus towards the members of any racially protected class. As such, she does not have standing to sue under § 1981 and summary judgment on this claim is awarded to the defendants.[10]

## VI. *Intentional Infliction of Emotional Distress*

▆ Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *Stuto v. Fleishman,* 164 F.3d 820 (2d Cir.1999); *see also Howell v. New York Post Co., Inc.,* 81 N.Y.2d 115, 121, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993). " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.' " *Howell* at 122, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (*quoting Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 303, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983)); Restatement (Second) of Torts, § 46 cmt. d (1965). Thus,

> [i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

Restatement (Second) of Torts § 46 cmt. d (1965). "Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." *Stuto,* 164 F.3d at 827.

▆ "New York courts appear to require that plaintiffs allege either an unrelenting campaign of day in, day out harassment or that the harassment was accompanied by physical threats, in order to state a cognizable claim for intentional infliction of emotional distress." *Nunez v. A–T Financial Information Inc.,* 957 F.Supp. 438, 442 (S.D.N.Y.1997); *see also O'Reilly v. Executone of Albany, Inc.,* 121 A.D.2d 772, 773, 503 N.Y.S.2d 185 (3d Dep't 1986); *Persaud v. S. Axelrod Co.,*

---

10. Even assuming that Ticali had standing under § 1981 and could make out a *prima facie* case, she cannot demonstrate any questions of material fact with regard to her claim that the defendants' actions were discriminatory. *See* Section III, C, *supra.* Accordingly, her § 1981 claim fails for this reason as well.

1996 WL 11197 (S.D.N.Y.1996). In addition, New York courts have made clear that the "use of religious, ethnic or racial aspersions to denigrate a person ... is not sufficiently egregious conduct to sustain a claim" of intentional infliction of emotional distress. *Graham ex rel. Graham v. Guilderland Cent. School Dist.*, 681 N.Y.S.2d 831, 832 (3d Dep't 1998); *see also Leibowitz v. Bank Leumi Trust Co. of N.Y.*, 152 A.D.2d 169, 548 N.Y.S.2d 513 (2d Dep't 1989).

Several New York courts have dismissed cases involving acts of harassment related to employment decisions on the ground that such conduct was not extreme and outrageous. For example, in *Murphy*, 58 N.Y.2d at 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, the plaintiff alleged that he was transferred and demoted for reporting fraud, coerced to leave by being told that he would never be allowed to advance, discharged and ordered to leave immediately after reporting other alleged in-house illegal conduct, and then forcibly and publicly escorted from the building by guards when he returned the next day to pick up his belongings. The Court of Appeals held that this conduct fell "far short" of the tort's "strict standard" for outrageous behavior. *Id.* at 303, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86.

Similarly, in *Foley v. Mobil Chemical Co.*, 214 A.D.2d 1003, 1005, 626 N.Y.S.2d 906 (4th Dep't 1995), the court found that although the discrimination and sexual harassment allegedly committed by the defendants represented "wholly inappropriate" behavior, it was not sufficiently outrageous to state a cause of action for intentional infliction of emotional distress. *Id.; see also Jaffe v. National League for Nursing*, 222 A.D.2d 233, 233, 635 N.Y.S.2d 9 (1st Dep't 1995) (holding that "a case of alleged employee harassment and intimidation, leading to forced resignation ... [fell] far short of the rigorous standard of outrageous conduct necessary to maintain a cause of action for intentional infliction of emotional distress.")

In this case, Ticali has failed to allege any conduct that is sufficiently "extreme and outrageous" to meet the stringent New York standard enunciated in the foregoing cases. The crux of her intentional infliction of emotional distress claim is that Chesnavage subjected her to "pervasive verbal abuse and false ridicule of her self-esteem." However, even taking all Ticali's allegations as true, she only points to a handful of incidents that occurred over a three-year period. None of those incidents rise to such an extreme or outrageous level as to meet the threshold requirements for the tort. Chesnavage's conduct may have been unpleasant and unprofessional, however, this is not a case "where severe mental pain or anguish [was] inflicted through a deliberate and malicious campaign of harassment or intimidation." *See Nader v. General Motors Corp.*, 25 N.Y.2d 560, 569, 255 N.E.2d 765, 307 N.Y.S.2d 647 (1970). In sum, "my feelings were hurt" does not state a viable claim for intentional infliction of emotional distress. Accordingly, defendants' motion for summary judgment on this claim is granted; plaintiff's intentional infliction of emotional distress claim is dismissed.

VII. *New York Human Rights' Law Claims*

Plaintiff's claims under N.Y. Exec Law § 296 *et seq.* are dismissed as well. As the Second Circuit recently observed, "[w]e have frequently noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629 n. 1 (2d Cir. 1997); *see also Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714–715 and 716 n. 6 (2d Cir.1996) (same); *Ramos v. City of New York*, 1997 WL 410493, *5 (S.D.N.Y.1997) (same); *Owens v. Waldorf-Astoria Corp.*, 1997 WL 251556 (S.D.N.Y. 1997) (same). Plaintiff's inability to establish a *prima facie* case under Title VII is fatal to her claims under state law.

## CONCLUSION

For the foregoing reasons plaintiff's motion for summary judgment is denied and defendants' motion for summary judgment is granted.

**SO ORDERED.**