Roberta S. SALMON, Plaintiff,

v.

**WEST CLARK COMMUNITY SCHOOLS, Defendant.**

No. NA 98–170–C–B/S.

United States District Court,
S.D. Indiana,
New Albany Division.

Aug. 24, 1999.

Oliver H. Barber Jr., Barber Banaszynski & Associates, Louisville, KY, for plaintiff.

James A. Lang, Jeffersonville, IN, Thomas E. Wheeler II, Bose, McKinney & Evans, Indianapolis, IN, for defendant.

### ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff, Roberta S. Salmon ("Salmon"), brings this action against defendant, West Clark Community Schools ("the School"), pursuant to the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Salmon claims that the School discriminated against her because of her disability, a degenerative eye disease that resulted in her legal blindness, when it attempted to accommodate her disability by appointing her to a full-time position teaching fourth grade elementary students, instead of assigning her to teach full-time in a junior high setting. The School moves for sum-

mary judgment, rejoining that its efforts to accommodate Salmon were appropriate under the ADA and that it did not retaliate against Salmon for reporting her disability. For the reasons discussed, the School's motion must be *GRANTED*.

## Background

West Clark Community Schools hired Roberta Salmon in 1985 as an elementary school teacher at Memphis Elementary School. Salmon was certified to teach General Elementary, defined as grades one through six. *See* Pl.'s Resp. at 2. In January 1989, Salmon completed her course-work for a Master's degree and received endorsements on her teaching license to teach language arts, social studies and science at the junior high school level (grades seven through nine). *Id.* Salmon requested a junior high placement following her junior high certification, but apparently did not teach any junior high classes until 1994. Between 1985 and 1992, Salmon taught various grades in elementary school, with her last assignment during that period at Henryville Elementary School teaching fourth grade. *Id.*

On August 4, 1992, Salmon expressed an interest in a gifted/talented ("GT") position teaching elementary students, partially located at the Silver Creek Junior High School ("SCJHS"). On August 19, 1992, the School assigned Salmon to the GT teaching position. *Id.* It consisted of teaching a GT magnet program to sixth graders for the morning (at SCJHS) and driving to four elementary schools in the afternoon to act as an itinerant GT resource teacher for fifth grade students at those locations. *Id.* at 3. While Salmon's sixth grade morning classes were located at SCJHS, her pupils still were elementary level. During the afternoon sessions, Salmon apparently would travel to each elementary school and "pull-out" the GT fifth-graders from their normal classes. Her duties required her to drive to Borden Elementary School (twelve miles from SCJHS) on Mondays, Henryville Elementary School (eleven miles from SCJHS) on Tuesdays, Sellersburg Elementary School on Wednesdays,

and Stout Elementary School on Thursdays. On Fridays she traveled to Wilson Center to prepare her class materials. *See* Salmon Dep. at 33.

In 1994, the School altered the GT program located at SCJHS due to parental complaints that the sixth graders in the morning program were not being taught in their respective elementary schools. As a result, the School discontinued the morning magnet program at SCJHS and moved the sixth-graders back to their elementary schools, where they were taught on the same "pull-out" basis as the fifth graders. From academic years 1994–95 to 1997–98, Salmon continued her afternoon sessions teaching elementary students without interruption, but the modification in the GT program removed her morning responsibilities, so she picked up a Spanish class, an English class, and study skills classes at SCJHS, teaching seventh and eighth grade students. *See* Pl.'s Resp. at 3.

In May and June 1997, Dr. Eric Berman, a specialist in Neuro Ophthalmology, treated Salmon and diagnosed her with retinitis pigmentosa sine pigmento, a degenerative eye disease characterized by decreased peripheral vision and difficulty with night vision. *Id.* at 3–4. In June 1998, Dr. Lowenthal, Dr. Berman's partner, described Salmon's condition as "a visual field constriction to within the central 20˙in each eye, and for this reason she is considered legally blind by visual field criteria." *Id.* at 4.

On March 6, 1998, Salmon met with the School's Superintendent, Terry E. Smith ("Smith"), and an Instructional Assistant, Robert Shireman ("Shireman"), and informed them for the first time that she gradually was becoming restricted in her driving due to a degenerative eye condition. *Id.* Salmon's self-stated purpose of the meeting "was to inform administration of my inability to continue commuting to five schools per week due to a medical condition (which I asked be kept confidential)." *See* Def.'s Ex. 1–I (Salmon June 6, 1998, letter to School Board). In her de-

position, Salmon beats a hasty retreat from the "inability to continue commuting" language she used in her own letter, contending that she was able to drive, although it "would be difficult" for her to commute and could become "gradually more difficult for me to drive from one building to the next, because [her condition] ... wasn't going to get better." Salmon Dep. at 63–64.

In a second letter after the March 6 meeting (addressed to Smith), Salmon described the March 6 meeting as follows: "[o]riginally I met with you and Mr. Shireman to advise you of my condition and how driving to five schools per week in fulfilling the elementary responsibilities of my current teaching assignment was becoming increasingly hazardous." Def.'s Ex. 1–L (Salmon June 15, 1998, letter to Smith). Finally, in her affidavit to the Equal Employment Opportunity Commission ("EEOC"), Salmon summarized the content of the March 6, 1998, conference with Smith and Shireman: "[o]n March 6, 1998 I met with the superintendent of my school corporation to inform him of a medical condition which I believed put the corporation & myself at risk. I asked that my medical diagnosis/condition be kept in confidence. At this meeting the superintendent indicated he would work with me to accommodate my disability." Salmon Dep. at 72–74.

Salmon also informed Smith and Shireman during their March 6 meeting that she preferred to keep her morning junior high classes at SCJHS, and to pick up additional classes at that location for the full teaching day, a result that necessarily would supplant her teaching elementary students and traveling during the afternoon. See Def.'s Ex. 1–I.

Salmon and Smith also discussed various options to accommodate her disability, with Smith suggesting that they attempt to fashion an assignment for the following school year that "wouldn't entail [Salmon's] driving," to which she responded "that would be fine." Salmon Dep. at 68. One option Smith considered during the March 6 meeting was to maintain Salmon's morning schedule at SCJHS, and to create a new part-time position for her at the Silver Creek High School ("SCHS") teaching ninth grade English during the afternoon. Id. at 68–69. Salmon noted that this possibility raised a concern for the high school's accreditation, however, because even though she was authorized to teach ninth graders, she did not have a license to teach in the high school setting. Id. at 69–70.

On April 8, 1998, Salmon completed the School's annual "Teacher Survey," which solicited teachers' elaborations on their teaching preferences, retirement plans and salary adjustments for the following school year. See Def.'s Ex. 1–G. In response to the questions, "Do you prefer being assigned to the same building?" and "Do you prefer the same teaching assignment next year?" Salmon circled the answers "yes." She added qualifications to her "yes" answers, however, explaining in writing that "[s]ince I am gradually becoming restricted in my driving, I prefer being at *one* building closest to my home & at the junior high level since I have no high school credentials." Id. (emphasis in original). Salmon also wrote that "I prefer not traveling from building to building." Id.

On May 14, 1998, the School Board of Trustees ("the Board") conducted a routine public meeting (the Board publicly distributes its agenda in advance), where Board members discussed the necessity of modifying Salmon's current GT job responsibilities and possibly reassigning her to a different teaching position. See Smith Dep. 43–49, Ex. 3. Smith broached the topic of Salmon's picking up afternoon classes at SCHS, although some Board members were reluctant to create new teaching assignments at the high school. Id. at 44–45. One of the principals in the audience, Mr. Lancioni of Henryville Elementary School, interjected that he had a full-time position available and would like to have Salmon return to his school, where she taught full-time in 1992. Id. The

Board did not make a personnel decision regarding Salmon on May 14 (one Board member moved to table the issue), and instead requested that Smith collaborate with the various principals involved before deciding on a course of action. *Id.* Although the Board entrusted Smith with the authority to decide Salmon's appointment, he typically did not make final determinations on personnel assignments, and he felt more comfortable gauging the principals' input and returning to the Board for its final decision, which he did a month later on June 11, 1998. *Id.* at 46–47.

During the interim, Smith contacted the three principals of SCJHS, SCHS and Henryville Elementary. Mr. Bailey of SCJHS approved of Salmon's transferring full-time to Henryville Elementary as long as her morning classes were covered. Mr. Crabtree of SCHS could utilize Salmon to create another ninth grade English section in the afternoon, but he noted that a reduction of class size was not essential. Mr. Lancioni of Henryville Elementary reiterated his earlier position that he would be pleased to have Salmon fill a full-time teaching position vacancy in his school. *See* Smith Dep. at 49–50.

Smith also met with Salmon again and obtained additional medical information about her condition prior to the Board's June 11, 1998, meeting. On May 27, 1998, Dr. Berman detailed Salmon's condition in a letter sent to the School, which Smith relied upon as one factor favoring Salmon's transfer to Henryville Elementary. *See* Def.'s Ex. 1–H; Smith Dep. at 52–53. Dr. Berman stated that due to Salmon's decreased peripheral vision, "it would be difficult for her to do any work which would require a lot of tasks of observation of children at distance. . . . I think that if she is in a limited setting, where people are in one place, she has good central vision, and I think she would do fine, however, I think that it may be more of a problem if she is in an outdoor area or a cafeteria where she has to pay attention to a lot of peripheral tasks." *Id.* Smith believed that an elementary school setting, where teachers are charged with one class of students in the same room for the entire day, involved less peripheral activity of students compared to the junior high or high school settings, where students (and sometimes teachers) rotate classes on an hourly basis after each "bell." *See* Smith Dep. at 88–89.

Smith and Salmon also met sometime in early June to discuss the recommendation he considered making to the Board regarding her teaching appointment. *See* Smith Dep. 58–60; Def.'s Ex. 1–I. Smith apparently informed Salmon that he intended to recommend that she be transferred to the full-time position at Henryville Elementary for the following school year. *Id.* Salmon requested that Smith reconsider this option, contending without explanation that her elementary placement would be perilous to both the students and herself. On June 6, 1998, Salmon put pen to paper in a letter to the School Board and "unequivocal[ly]" voiced her dissatisfaction with the thought of her full-time appointment to Henryville Elementary. Def.'s Ex. 1–I.

On June 11, 1998, the Board conducted its routine monthly meeting. Smith recommended to the Board that, after consideration of the available options, Salmon fill the vacancy in the full-time teaching position at Henryville Elementary (either fourth or sixth grade), rather than creating a new part-time position for her to teach English at SCHS in the afternoon.

Several reasons motivated Smith's recommendation. He believed that Salmon's medical condition and driving difficulties resulted in a need to locate an afternoon assignment for her in lieu of her traveling elementary responsibilities. *See* Smith Dep. at 52–57. Also, some Board members were reluctant to incur the cost of creating another part-time teaching position at the high school, an option that would have allowed Salmon to maintain her morning assignment at SCJHS. While the afternoon high school assignment teaching English would not have increased Salmon's salary, the vacancy at

elementary would have remained unfilled, which meant that the School would have been forced to hire another full-time teacher. *Id.* If Salmon filled the vacancy, however, a part-time teacher at the junior high school, Ms. Schindler, could pick-up Salmon's morning classes and remain part-time, as Ms. Schindler could add three classes to her two class schedule without being considered full-time for salary purposes. Also, because the afternoon English classes that could have been formed specially for Salmon were never actually created, the School did not have to hire a teacher to cover those theoretical classes. (In reaction to Salmon's conveying her concern about her condition and ability to commute, the School restructured the afternoon GT elementary classes apparently without adding teaching personnel, and it eliminated the traveling itinerant GT teaching position altogether. *See* Compl. ¶ 19; Ans. ¶ 20; Smith Dep. at 29, 67–69.) The practical effect of the School's attempt to reassign Salmon to a full-time job that did not involve driving is that it minimized its financial loss under the circumstances, an effort motivated by pressure from the teachers' union to increase salaries. *Id.*

The Board unanimously accepted Smith's recommendation to assign Salmon to a full-time teaching position at Henryville Elementary School (with a classroom aide). Displeased with this development, Salmon wrote a letter to Smith dated June 15, 1998, in which she emphasized that her teaching in an elementary school setting "is not an appropriate placement for me due to my worsening condition and the risk it may pose to me and those in my charge." Def.'s Ex. 1–L. She further characterized her placement in an elementary setting as "perilous," "stressful," "traumatic," "harmful," and concluded that "there is a substantial risk that injury could result from my employment as an elementary teacher." [1] *Id.* Salmon also stated that driving to five different schools in the afternoon to fulfill her elementary assignment "was becoming increasingly hazardous," and she "once again" requested that her condition be accommodated with a placement "at the junior high" and that the Board reconsider its decision. [2] *Id.*

On June 20, 1998, Smith responded to Salmon's letter and recognized that she preferred a full-time teaching position at SCJHS, rather than one at Henryville Elementary. *See* Def.'s Ex. 1–M. He explained the bases for the Board's decision, stating that the School did not need an additional full-time position at SCJHS, and that the creation of high school English classes for her to teach in the afternoon would require the School to hire an additional teacher to fill the Henryville Elementary vacancy. Smith also failed to see how her condition favored her placement in junior high instead of in an elementary setting. On the contrary, he believed that the self-contained classroom of the elementary school minimized students' movement into and out of the classroom compared to a bell schedule of the junior high and high schools. Smith also believed that the elementary setting would allow Salmon to avoid changing rooms or buildings each day, which accommodated her request to be assigned to one location. *Id.*

On July 15, 1998, Salmon filed her charge of discrimination with the EEOC,

---

**1.** Salmon never offers any explanation for why teaching fourth or sixth graders must be more "perilous" than teaching seventh or eighth graders in light of her eye condition. *See* discussion *infra* Part A.

**2.** In her June 15, 1998 letter, Salmon attached a June 8, 1998, letter written by Dr. Lowenthal, who described Salmon as "legally blind." Def.'s Ex. 1–J. The doctor opined that Salmon could function as a teacher if children were not "moving about the room" and

if she avoided laboratory situations. He added that Salmon "relates difficulties in working with the elementary school level," but he makes no independent medical judgment that Salmon's eye condition makes it any more or less difficult for her to teach elementary school rather than junior high. Indeed, Dr. Lowenthal relies upon Salmon's own unsubstantiated and self-serving representations that a junior high placement would be the only appropriate teaching assignment given her condition.

asserting that the school violated the ADA by failing to accommodate her request "for a change in my teaching assignment" after she informed Smith of her disability on March 6, 1998. Def.'s Ex. 1–N. On July 24, 1998, Smith authored a letter to Salmon acknowledging her request that the Board meet with her in executive session to reconsider her teaching assignment, which the Board declined to do since it believed that it had already made a "reasonable accommodation" for Salmon under the circumstances. See Def.'s Ex. 1–P; Smith Dep. 73–74. The parties exchanged an additional salvo of letters at the end of July, with Salmon (through her union representative) suggesting for the first time that she would consider teaching part-time (assuming a full-time "secondary" level position would become available), and with the School suggesting accommodations for Salmon at her Henryville Elementary assignment.[3] See Def.'s Exs. 1–O, 1–Q. On August 12, 1998, Smith met with Salmon's union representatives, including the union's president, to discuss Salmon's teaching assignment. See Salmon Dep. 114–15. Smith represented that he was willing to transfer Salmon to a position for which she was qualified if one became available, but he reiterated that her assignment for the 1998–99 school year remained a reasonable accommodation. Id.; Def.'s Br. Summ. J. at 15.

On August 14, 1998, prior to the start of the 1998–99 school year, Smith directed Principal Lancioni to further accommodate Salmon by not assigning her to "cafeteria duty, playground supervision, or bus duty." Def.'s Ex. 1–S. By letter dated August 18, 1998, Salmon "unwillingly" accepted the school's "accommodation" for the 1998–99 academic year even though she contended that the assignment "presents a genuine substantial risk that injury may occur." Def.'s Ex. 1–U. On August 24, 1998, Smith responded in kind, noting that her letter did "not state what the 'genuine substantial risk' of injury is or to

whom it may occur," and thanking Salmon for accepting her assignment. Def.'s Ex. 1–W.

On October 16, 1998, Salmon received her EEOC right-to-sue letter, and filed her Verified Complaint in this action on October 26, 1998. On November 23, 1998, Salmon filed a motion for a preliminary injunction, which she withdrew on February 8, 1999, opting instead to defend against the School's motion for summary judgment. See Pl.'s Resp. at 13. The parties apparently attempted without success to reach a mutually agreeable settlement of this matter. The 1999–2000 academic school year is upon us, so we turn to resolve the merits of Salmon's claims without further delay.

### Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir.1998). Yet, neither the mere existence of some alleged factual dispute between the parties, Baulos v. Roadway Express, Inc., 139 F.3d 1147, 1152 (7th Cir. 1998), nor the existence of "some metaphysical doubt as to the material facts," Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 571 (7th Cir.1998) (internal quotations omitted) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), is sufficient to defeat a motion for summary judgment.

---

**3.** On August 27, 1998, Salmon requested Smith not to deduct union dues from her paycheck because "I am no longer a member of said association." Def.'s Ex. 1–X.

In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir.1992). When summary judgment is sought in an employment discrimination case, as here, the criteria associated with summary judgment must be applied with "added scrutiny because matters of intent and credibility are crucial issues." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 883 (7th Cir.1998). However, "employment discrimination cases are not governed by a separate set of rules ... they remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts." *Patterson v. Chicago Assoc. for Retarded Citizens*, 150 F.3d 719, 723 (7th Cir.1998) (internal quotations omitted) (*quoting Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997)). Thus, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but also required. *See Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989).

*Americans With Disabilities Act[4]*

### A. Reasonable Accommodation

Salmon asserts a failure to accommodate claim against the School, pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* Salmon charges that the School's assignment of her to Henryville Elementary School represented a breakdown in the interactive process for which the School bears responsibility. Salmon also contends that when the School attempted to accommodate her concerns about teaching her afternoon elementary classes, it unreasonably removed her morning teaching responsibilities at the junior high school. We disagree with Salmon on both fronts and find that the School fashioned a reasonable accommodation for Salmon's eye disease after she reported it.

The ADA forbids a covered employer from discriminating "against a qualified individual with a disability because of the disability of the individual in regard to job application procedures, the hiring, advancement, or discharge of employees, ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The parties do not dispute that Salmon is a "qualified individual with a disability," but they do contest whether the School discriminated against Salmon by failing to reasonably accommodate that disability. The ADA prohibits a number of forms of disability discrimination, including discrimination by

> (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the

---

4. In the preliminary statement of her complaint, Salmon states that she has brought this action pursuant to the ADA, invoking that statute as her jurisdictional basis. Salmon also alludes generally to the Rehabilitation Act in the latter half of her complaint but without ever developing a legal argument under that statute in any of her subsequent pleadings. In any event, the ADA and the Rehabilitation Act are virtually identical, although the ADA has a broader scope. *See Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998) (construing "the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act"). Therefore, Salmon's putative claims under the Rehabilitation Act are dismissed for the same reasons animating our dismissal of her ADA claims. *See Crawford v. Indiana Dep't of Corrections*, 115 F.3d 481, 483 (7th Cir.1997) ("The Rehabilitation Act is materially identical to and the model for the ADA, except that it is limited to programs that receive federal financial assistance.... [s]ince the ADA has a broader scope, we shall confine our discussion to it.") (citations omitted); *Rothman v. Emory Univ.*, 123 F.3d 446, 450 (7th Cir.1997) (finding that the Rehabilitation Act and the ADA are "nearly identical" and noting that both statutes are interpreted "consistent with Title VII").

accommodation would impose an undue hardship on the operation of the business of such covered entity; . . .

42 U.S.C. § 12112(b)(5)(A).

■ Under the ADA, an employee begins the accommodation "process" by informing her employer of her disability, which triggers an employer's liability for failure to provide accommodations. *Beck v. University of Wis. Bd. of Regents,* 75 F.3d 1130, 1134 (7th Cir.1996). "Once an employer's responsibility to provide reasonable accommodation is triggered, the employer must engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir.1996). As our circuit has noted, the ADA's "reasonable accommodation" element imposes a duty upon employers to engage in a flexible, interactive process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodations that might enable the employee to continue working. *Hendricks–Robinson v. Excel Corp.,* 154 F.3d 685, 693 (7th Cir.1998); *see also* 29 C.F.R. § 1630.2(*o*)(3); 29 C.F.R. Pt. 1630, App. § 1630.9.

■ However, while the employer "has at least some responsibility in determining the necessary accommodation," the employee likewise must participate meaningfully in determining what specific actions must be taken by the employer. *Beck,* 75 F.3d at 1135. But because neither the ADA nor the EEOC's regulations implementing it assign responsibility for when the interactive process fails, the Seventh Circuit has developed a flexible approach to determine which party is at fault, emphasizing principles of good faith and reasonable effort:

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the [interactive] process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to partici-pate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility. . . .
>
> . . . .
>
> Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown. But where, as here, the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow.

*Id.* at 1135, 1137.

■ Salmon's assertion that the School disrupted the interactive process consists of a fanciful and unsupported contortion of the facts in the record. Salmon claims that she never requested to be transferred (despite considerable evidence to the contrary) and that Smith "never attempted to clarify what [Salmon] needed, how bad her condition was, or how she could continue her job . . ., there was never any attempt or discussion of accommodating her Junior High and Gifted/Talented assignment." Pl.'s Resp. at 19–20. The undisputed evidence in the record belies this characterization of the facts.

The interactive process between Smith and Salmon began when Salmon alerted Smith to the fact of her degenerative eye condition on March 6, 1998. Salmon testified in her deposition that she arranged that meeting "to say, 'I have this terrible debilitating condition, degenerative disease, and we need to sit and plan and think what are we going to do with me in the future?' Those were my feelings . . . . I tried to get that out the best I could

during that meeting." Salmon Dep. at 72. And Salmon succeeded in doing just that, although she now complains that Smith took her too seriously and acted too promptly by reassigning her to a different teaching position for the following academic year that did not involve traveling.

By claiming that she never conveyed to the School that she wanted or needed a transfer, Salmon attempts to avoid summary judgment by placing blame on the School for failing to conceive of a method for her to retain her afternoon elementary classes. Yet, Salmon attempted in her dealings with the School to use her disability as a reason to replace her elementary classes with a full-time position at the junior high school, and she balked when it did not do so, reversing course and claiming during this litigation (for the first time) that she really could have taught those GT elementary classes all along. Essentially, Salmon gambled that reporting her disability would secure her a full-time teaching position at the junior high school, and when that strategy backfired, she turned to the ADA as a method to achieve that objective. Clearly this approach is disingenuous. Aside from the obvious fact that Salmon, as an equal contributor in the "interactive process," never herself suggested this alternative, the undisputed evidence reveals that she clearly expressed a preference for reassignment to the junior high school for the following academic year. It does not take much for an employee to activate an employer's potential liability under the ADA, and we can hardly fault the School for promptly heeding Salmon's ominous warning that her "terrible debilitating condition" required accommodation "at some point in the future." *Id; see Hendricks–Robinson*, 154 F.3d at 694 ("A request as straightforward as asking for continued employment is a sufficient request for an accommodation."); *Miller v. Illinois Dep't of Corrections*, 107 F.3d 483, 486–87 (7th Cir.1997) ("Even if an employee who as here becomes disabled while employed just says to the employer, 'I want to keep working for you—do you have any suggestions?' the employer has a duty under the Act to ascertain whether he has some job that the employee might be able to fill.").

Salmon documented her preference to change her afternoon assignment on a number of occasions, a posture at odds with her unsupported position on summary judgment that she never told the School that her disability justified a removal of her GT afternoon classes for the following academic year. During her March 6, 1998, meeting with Superintendent Smith, Salmon declared that her degenerative eye condition, which "wasn't going to get better," made commuting difficult. Salmon Dep. at 63–64. Her own recitation of the content of that meeting, as explained in two separate letters she addressed to the Board and Smith and in her EEOC affidavit, confirmed that her elementary responsibilities "were becoming increasingly hazardous," that her eye condition "put the corporation and myself at risk," and that she had requested a "change in my teaching assignment." In her June 6, 1998, letter to the School Board, she noted that she informed the administration at that March 6 meeting of her "inability to continue commuting to five schools per week." *See* Def.'s Ex. 1–I. She also reiterated to the Board that "being placed in an elementary setting could be a perilous action for both students and myself," and that replacing her afternoon elementary classes with classes at the junior high school "would be the most expeditious solution to my particular situation." Salmon likewise claimed in her letter that during her second meeting with Smith, which occurred in early June, she informed him of the "impropriety of an elementary placement relative to my medical condition." She specifically requested that the Board refrain from transferring her to the elementary setting for the following academic year.

Similarly, Salmon states in her June 15, 1998, letter to Smith that she preferred a junior high school appointment to replace her increasingly hazardous afternoon elementary assignment, again stressing with-

out explanation that her worsening medical condition infused risk of injury into the elementary setting. *See* Def.'s Ex. 1–L.

Salmon's responses on the April 1998, "Teacher Survey" also confirmed her willingness to forego teaching afternoon elementary classes for the next academic year. She emphasized that she preferred teaching "at the junior high level" and being placed at *"one"* building due to her concern about "gradually becoming restricted in my driving." Def.'s Ex. 1–G.

In fact, Salmon's motivation to replace her elementary teaching assignment with a junior high level placement pre-dates her disability, as she requested a junior high position as early as 1989. *See* Pl.'s Resp. at 2. Of course, the School was under no obligation to transfer Salmon to the junior high school setting (back then or now) if it preferred that she teach elementary students, especially considering that the vast majority of her fourteen years of experience accrued at the elementary level. Indeed, Salmon taught morning classes at the junior high school for three years only because her elementary classes at that location were eliminated due to parental complaints about the structure of the GT program; her primary responsibility for the elementary GT program continued in her capacity as the afternoon itinerant GT teacher and coordinator.

We think it is far from coincidental that Salmon happened to time the disclosure of her disability on the eve of the School's allocation of teaching assignments for the following year. Despite the fact that Salmon knew of her condition in May/June 1997, she waited to disclose her condition until March 1998, one month prior to the School's distribution of its annual "Teachers Survey," by which it would gauge personnel and budgetary demands for the following year. Salmon's hesitance to inform the School of her disability finds support in her repeated (and understandable) requests that the School maintain the confidentially of her condition, and the fact that Salmon overcame her reluctance to divulge such sensitive information highlights the timing of that decision. Perhaps Salmon perceived her condition as having advanced so significantly that she felt a duty to tell the School of the danger involved in her carrying out her afternoon responsibilities, or perhaps her timing related strictly to her desire to obtain a full-time junior high position. Either way, the result is the same for our purposes: the School acted more than reasonably in fashioning an accommodation for the following school year after Salmon disclosed her condition and conveyed her desire to have her afternoon elementary classes replaced with a junior high assignment.

■ An application of the principles of good faith and reasonable effort also compels our conclusion that no reasonable jury could find that the School should shoulder the responsibility for the alleged breakdown in the interactive process. Superintendent Smith personally met with Salmon on at least two occasions to discuss her eye condition and a possible accommodation. Salmon and Smith together agreed that a placement that did not involve driving should replace her afternoon GT classes for the following year, which might have included Salmon's teaching high school English to ninth graders. They also exchanged a host of written correspondence detailing their respective positions and proposals on the most appropriate accommodation. Smith even agreed to meet with Salmon's union representatives after Salmon engaged their assistance, with whom he also exchanged letters regarding Salmon's eye condition and the School's motivations for assigning Salmon to Henryville Elementary. The School's internal processes also reflect its good faith efforts to accommodate Salmon, as the School Board discussed her situation during two consecutive monthly meetings, and Smith elicited the views of each principal who may have been affected by Salmon's transfer. The School continued its accommodation efforts even after it assigned Salmon to Henryville Elementary by providing her with a classroom aide and by exempting

her from cafeteria duty, playground supervision and bus duty.

The record establishes that the lines of communication between the parties were wide open, but that Salmon simply did not like what she heard coming from the other end. And while the parties' interactions certainly did not result in an inspired or extensive array of possible accommodations, a lack of ingenuity does not suffice to impose ADA liability for an alleged "breakdown" in the interactive process under these circumstances, especially where Salmon never proposed that she keep her afternoon elementary GT teaching assignment. Based on the evidence before us, the School did not obstruct the interactive process; it communicated with Salmon and provided an accommodation based on her own representations about her disabling condition. While Salmon claims that the School is at fault for allegedly not gathering sufficient medical information about her condition prior to deciding her placement, Salmon had made her preferences abundantly clear to the School authorities more than once.

If any party bears blame for failing to facilitate the exchange of information, it is Salmon, for she showed her medical charts to Smith during their March 6 meeting but refused to provide him with a copy, a decision that had the practical effect of ensuring that the School would rely upon her oral representations about her medical condition. *See* Shireman Dep. at 21–23. Even when Smith provided medical letters from her physicians, Smith attempted to fashion a placement that comported with her physician's medical opinions. Salmon does not explain how the School labored under any misconceptions about her disability or her placement preferences given that they had her own representations about her condition. In short, we find no factual basis to conclude that the School acted in bad faith or that its efforts were sufficiently minimal to impose ADA liability in this case.

■ Furthermore, Salmon fails to dispute in any convincing fashion the reason-ableness of her transfer to Henryville Elementary, aside from her unsupported blanket assertion that she disliked the elementary setting and believed it was "perilous" and risked "injury" to her and her students. *See supra* notes 1 & 2. As we have previously noted, Salmon never offers a coherent explanation (or any explanation at all for that matter) for why teaching fourth or sixth graders must be more "perilous" than teaching seventh or eighth graders in light of her eye condition. In fact, her own deposition testimony contradicts itself on this hollow assertion. At one point in her deposition, she claims that her eyesight risked bodily harm to herself and her students at the elementary level compared to teaching junior high students. *See* Salmon Dep. at 127–29. At another point she claims that her case has nothing to do with the movement of children or bodily harm, but that her true complaint is that the School's accommodation resulted in her losing morning junior high school classes that she liked to teach. *Id.* at 102–05. Drawn further into the whipsaw of contradiction, Salmon next claims in her Response to the School's summary judgment motion that the "risk of injury" references she makes regarding her teaching of elementary classes do not refer to bodily injury at all. Rather, she claims that her concern about "injury" is primarily a risk of "injury to the learning process." Pl.'s Resp. at 13. Even if this strained interpretation of her own representations is taken as true, it does nothing to explain why her eye disease necessarily heightens the risk of injury to the learning process of elementary students compared to junior high students.

In a continuation of her logical backtrack, Salmon claims in her Response that the School should have fashioned some accommodation for her to keep both the morning schedule and her afternoon elementary classes, instead of transferring her full-time to one elementary school. She then claims that had she not been reassigned to Henryville Elementary, she could have functioned quite effectively in

teaching her afternoon GT students if her disability were accommodated in some other, unspecified fashion. That those GT students were fifth-grade *elementary* students, the same level of students that she claimed she could not teach for fear of causing some type of "injury" to herself and her students, makes it plain that Salmon is playing fast and loose with the facts of this case in order to achieve the one (and only one) accommodation she will accept—a full-time teaching position at SCJHS. Indeed, Salmon completes the convolutions of contradiction in her Response, asserting (when attempting to demonstrate that she met the ADA's requirement that she could perform the "essential functions" of elementary teaching) that the "danger" she feared from teaching the elementary students really "had to do with the learning process and her missing feedback from students in her periphery." Pl.'s Resp. at 20. Of course, she offers no supporting evidence or hypothesis explaining how this purported concern, like her purported worry about physical harm, applies to elementary students but not to junior high students. In the end, Salmon utterly fails to impugn the reasonableness of the School's accommodation, and it is not our role to try to conceive arguments for Salmon postulating how peripheral eyesight is more important in one educational setting than another.

 Salmon essentially claims that the School is responsible for a breakdown in the interactive process because the School's accommodation resulted in an outcome she did not prefer, to wit, her transfer from the junior high school where she enjoyed teaching. However, it is a well established principle under the ADA that an employee requesting an accommodation is not entitled to the placement of his or her preference. *See Corder v. Lucent Technologies, Inc.*, 162 F.3d 924, 928 (7th Cir.1998) ("The fact that [plaintiff] would have preferred to work full-time in Vernon Hills is of no consequence, for as we have explained, [a]n employer is not obligated to provide an employee with the accommodation he requests or prefers, the employer

need only provide some reasonable accommodation.") (internal citations and quotations omitted). As we have said, the School exercised good faith and reasonable efforts to locate a suitable teaching position for Salmon. It was not required to create a part-time afternoon position for Salmon at either the high school or the junior high school, nor was it required to ignore Salmon's candidacy for a full-time vacancy at the elementary school for the next academic year simply because she had taught morning classes elsewhere in the past. The ADA also does not mandate the School either to "bump" a teacher from the junior high or high school to create a teaching vacancy for Salmon (*Pond v. Michelin N. America, Inc.*, 183 F.3d 592 (7th Cir. 1999)), or to promote her as an accommodation for her disability. *See Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 699 (7th Cir.1998). It does not require the best, the most preferred, or even the most obvious accommodation, as long as the accommodation is reasonable:

> An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation. Thus, when an employee requests a transfer as reasonable accommodation and the employer offers alternative reasonable accommodation, which the employee then refuses, the employer cannot be liable for failing to reasonably accommodate the employee by not transferring him to another position.

*Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir.1996) (internal citation omitted).

Has the interactive process broken down simply because the employer identifies a reasonable accommodation that the employee dislikes? Not under the facts of this case. Having relied upon Salmon's representations that her disability posed considerable challenges to her continued performance of the traveling elementary teaching position, the School explored the

option of transferring her to other teaching positions. Perhaps if Salmon had not set her sights on jettisoning her elementary classes and obtaining a full-time teaching position at the junior high school, she may have been able to suggest options that would have allowed her to continue teaching elementary students in the afternoon and junior high students in the morning, such as possibly the School's hiring of a driver to ease the burden of her five-school commute. *See Webster v. Methodist Occupational Health Ctrs., Inc.,* 141 F.3d 1236, 1238 (7th Cir.1998) ("[Plaintiff] chose the position that was most to her liking ... and insisted that [defendant] place her there and nowhere elseß(4)27 [a]n employee cannot refuse reasonable accommodation during the interactive process that the statute contemplates, and then after dismissal suggest something different and claim that the employer still has a duty to consider further accommodations."). But the parties apparently did not explore that option (or if they did, perhaps determined that it was not viable), and the School devised an assignment that it believed accommodated her disability and at the same time met its staffing needs.

Indeed, Salmon possessed no right to teach morning junior high classes, with or without her disability, and given her insistence on altering her afternoon elementary classes, her morning assignment became fungible in the School's attempt to locate an available teaching assignment for Salmon (*without* having to create another part-time afternoon position).[5] Yet, Salmon claims that since her disability prevented her only from teaching elementary classes, the School should have allowed her to keep her morning classes and created non-elementary classes for her to teach in the afternoon. She contends that because she is not licenced to teach in the high school setting, that leaves her, not surprisingly, with her job of choice—full-time junior high teaching.

We do not regard the School as being so handcuffed in considering its reasonable accommodation options. Salmon's full schedule became subject to change when she expressed a desire to relinquish her responsibility for afternoon elementary teaching. Salmon's availability to teach her morning classes was contingent upon her afternoon schedule, and when her disability altered the latter, it freed the school to consider her entire schedule in fashioning a reasonable accommodation. Salmon had one teaching assignment for the 1997–98 academic year, which consisted of a unique combination of specific morning and afternoon classes, and when Salmon chose to request a realignment of the School's structure of that assignment by requesting a transfer from her afternoon elementary duties, she loosened the moorings to her morning classes as well. Again, nothing in the ADA required the School to create a specially crafted assignment for Salmon, particularly where that accommodation would entail the School's creation of a new afternoon teaching assignment.

Teachers typically have their classes in one building, and Salmon's situation was unusual from the start, as the School fragmented her morning and afternoon elementary classes as part of a unique GT elementary program using the junior high school only as a suitable location. Her responsibilities assumed a hybrid quality when she originally picked up morning junior high classes after parents requested

---

5. In a July 23, 1998, letter to Smith, Salmon's union representative, for the first time, raised the possibility of Salmon's teaching part-time (only the morning junior high school classes), contingent upon her receiving a secondary level teaching assignment the following academic year if one became available. Aside from the delinquent manner in which Salmon's union representative raised the possibility (well after Salmon and Smith met and exchanged letters without either party mentioning that alternative and only weeks before the beginning of the 1998–99 school year), that option required the School to prioritize her assignment to her preferred teaching position, an obligation the ADA does not impose. The union representative also did not address the reasonableness of the School's placement of Salmon at Henryville Elementary.

that their elementary children remain in their usual buildings and no longer be taught in the junior high setting. Salmon's teaching responsibilities would become more attenuated from their original elementary purpose if we prevented the School from realigning her morning job responsibilities after she was relieved of her GT elementary duties (the very reason she found herself at junior high in the first place) because of her disability. Teaching appointments are particularly sensitive to yearly fluctuations in staffing needs and funding allocations, with teachers subjected to annual reassignment, and the School's vacancy at Henryville Elementary proved its best available option to accommodate Salmon's concerns about her traveling elementary teaching duties. In short, no reasonable trier of fact could conclude on the evidence before us that the School created or was otherwise responsible for the alleged breakdown in the interactive process, as it repeatedly communicated with Salmon in good faith and conceived a reasonable assignment in light of her condition. Accordingly, we *GRANT* the School's motion for summary judgment on Salmon's failure to accommodate claim.

### B. Retaliation

■ Salmon also alleges that the School retaliated against her for reporting her disability by assigning her to a full-time teaching position at Henryville Elementary School. *See* Pl.'s Resp. at 17. The School rejoins that Salmon's transfer was not an adverse employment action, and that even if Salmon proved a prima facie case of retaliation, its attempt to accommodate Salmon was a legitimate non-retaliatory reason for its actions. We agree and find insufficient evidence in the record for a reasonable jury to hold in Salmon's favor on her retaliation claim.

■ Retaliation, like other discriminatory actions, may be established either by direct evidence or by the indirect burden shifting method conceived in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Stevo v. CSX Transp., Inc.*, No. 97–3974, 1998 WL 516788, at *3 (7th Cir. July 27, 1998). The parties agree that the indirect burden-shifting method applies to Salmon's retaliation claim. *See* Pl.'s Resp. at 17; Def.'s Br. Support Summ.J. at 10–11. Under the *McDonnell Douglas* framework, Salmon bears the burden of demonstrating a prima facie case of retaliation, and if she succeeds, the burden of production shifts to the School to come forward with a legitimate, non-retaliatory reason for its actions.[6] *Id.* If the School produces such a non-retaliatory reason, the burden shifts back to Salmon to demonstrate that the School's proffered reasons for its adverse action were pretextual. *Id.; see Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir.1998) (finding that "[t]he elements of a retaliation claim are identical" under the ADA and Title VII). To demonstrate a prima facie case of retaliation under the ADA, Salmon must establish that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action. *See Talanda v. KFC Nat'l Management Co.*, 140 F.3d 1090, 1095–96 (7th Cir.1998).

Salmon's retaliation claim fails on at least three distinct grounds. First, as a threshold matter, she comes nowhere close to presenting sufficient evidence for a rational fact-finder to conclude that the School either retaliated or discriminated against her because she is disabled or because she reported her disability. On the contrary, the undisputed evidence indicates that Salmon voluntarily requested that the School reconsider her assignment

---

6. We note expressly here that we did not utilize this approach in the context of Salmon's reasonable accommodation claim because our circuit has recognized that the *McDonnell Douglas* test is "unnecessary and inappropriate" in reasonable accommodation claims under the ADA. *Hunter v. Habegger Corp.*, No. 97–2133, 1998 WL 104635, at *n. 5 (7th Cir. Mar.5, 1998) (internal quotations omitted) (quoting *Bultemeyer v. Fort Wayne Community Schs.*, 100 F.3d 1281, 1284 (7th Cir.1996)); *see Pond*, 183 F.3d at 597 n. 5.

in light of her disability, and while she did not receive her teaching assignment of choice, the School's attempt to accommodate her vision difficulties cannot be shaded by any fact in the record to establish that it was motivated by a retaliatory animus. *Cf. Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1454 (11th Cir.1998) ("Of course, a finding that [plaintiff's] transfer was purely voluntary would have been dispositive in the [defendant's] favor; a transfer cannot be 'because of a disability' if it occurred as the result of an employee's own request."). As we mentioned, the School exercised good faith in responding to Salmon's concerns about her future performance of the traveling elementary position and fashioned a suitable accommodation given Salmon's condition and its staffing needs. The evidence indicates that the School perceived Salmon's teaching abilities glowingly even after she reported her vision difficulties and assigned her to Henryville Elementary because of her qualifications, a perspective inconsistent with Salmon's unsupported contention that the School actually "retaliated" against her for divulging her disability.

■ Second, Salmon produces no evidence whatsoever to support her subjective opinion that her assignment to Henryville Elementary represented either a demotion or some other form of adverse employment action, a fact that dooms her prima facie retaliation case under the ADA. She also never attempts to assess the impact of her transfer on the "terms, conditions or privileges of [her] employment," which explains the lack of evidence in the record pertaining to the issue. 42 U.S.C. § 12112(a). We fully recognize that our circuit interprets the term "adverse employment action" broadly, and we acknowledge that an employment action may be adverse even if it falls short of outright termination:

[W]hen an employee is fired, or suffers a reduction in benefits or pay, it is clear that an employee has been the subject of an adverse employment action. But an employment action does not have to be

so easily quantified to be considered adverse for our purposes. "[A]dverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well." . . .

While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that "an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."

*Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996) (affirming summary judgment on plaintiff's Title VII retaliation claim, finding that plaintiff failed to prove that her poor performance evaluations constituted an adverse employment action) (citations omitted).

■ Hence, an adverse change in the terms and conditions of employment might include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *See Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.1993) (affirming summary judgment on plaintiff's ADEA discrimination claim, finding that plaintiff's transfer from an assistant vice president/management position at one bank branch to a loan officer/management position at another branch was not a materially adverse employment action; even though plaintiff's responsibilities changed, he failed to show that his new responsibilities were less significant than his previous duties).

Salmon's only attempt to carry her burden of demonstrating that her transfer was an adverse action is the following, speculative statement: "[A] transfer from a middle to an elementary school might also be thought to involve a significant loss of prestige, and perhaps long-term pros-

pects of advancement as well." Pl.'s Resp. at 19. However, Salmon offers no evidence to substantiate her claim, and the factual record demonstrates quite the opposite in this case. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 69 (7th Cir.1995) (noting that in assessing a motion for summary judgment, a court assumes that the record at trial would be identical to the record that has been compiled in the summary judgment proceedings).

It certainly is conceivable that an adverse employment action might include a teacher's transfer from one grade to another, such as if a teacher with twenty years of junior high school teaching experience found herself teaching elementary students for the first time. *See Rodriguez v. Board of Educ. of Eastchester Union Free Sch. Dist.*, 620 F.2d 362, 366 (2d Cir.1980) (finding that art teacher's transfer from junior high to elementary school adversely affected her employment status where the school declined to transfer either of two male art teachers with inferior teaching credentials; teacher, whose Master's and doctoral art degrees focused on junior high level programs, presented "substantially uncontradicted evidence that the art programs at the elementary level were so profoundly different from those in the junior high school as to render utterly useless her twenty years of experience and study in developing art programs for middle school children"). But where, as here, the teacher is transferred to the same level position at which she amassed the majority of her teaching experience, that teacher must exert some effort to demonstrate how the new position materially differs from the old one. Salmon has given us nothing of the sort.

We have no evidence suggesting that Salmon's reassignment was a demotion, that it involved significantly diminished job responsibilities, or that it inhibited her job advancement possibilities or otherwise was

perceived in the teaching community as a less distinguished position. Salmon does not claim that the School cut her benefits or salary, or that it reduced her ability to develop lesson plans, to hold parent-teacher conferences or to conduct her classes in the manner she sees fit. All we have before us is Salmon's subjective and otherwise unexplained dislike for a full-time elementary teaching position, despite her years of uninterrupted experience at the elementary level.[7] Salmon's personal outlook on the matter, without more, is insufficient to create a genuine issue of material fact that her transfer was an adverse action. *See Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir.1994) (finding that plaintiff failed to show that his transfer from a principal scientist to senior project manager constituted a materially adverse employment action; although the plaintiff's transfer resulted in his reporting to a former subordinate, a "bruised [ ] ego" represented plaintiff's perception of his transfer and therefore was insufficient to withstand the defendant's motion for summary judgment); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 885–86 (7th Cir.1989) (finding that principal's transfer to a different school where she shared the position with a co-principal was not an adverse employment action even though it subjectively caused her "humiliation," and noting that "public perceptions were not a term or condition of [plaintiff's] employment"); *Doe*, 145 F.3d at 1454; *Garber v. New York City Police Dep't*, No. 97–9191, 1998 WL 514222, at *2–4 (2d Cir. June 12, 1998).

In the absence of any evidence to the contrary, we cannot say that a reasonable jury could find that Salmon's new assignment affected the terms, conditions or privileges of her employment compared to her similar prior experience. Instead, Salmon's elementary assignment, under

---

**7.** Salmon also never alleges that the School perceived her transfer as a demotion. The evidence suggests the opposite conclusion, as Henryville Elementary's principal (and principals at the junior high and high schools)

viewed her quite favorably without regard to her disability, so much so that he intervened during the public School Board meeting (from his seat in the audience) to suggest that she fill the vacancy at his school.

the facts of this case, is better described as the type of "purely lateral transfer" that does not involve demotion in either form or substance. *See Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996) (finding that the involuntary transfer of plaintiff/sales representative from his previous territory to a reorganized territory, which included placement into a disciplinary "coaching" program, his selling a new product line, and at least a temporary reduction in sales commissions did not qualify as a materially adverse employment action); *cf. Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir.1994) (holding that a shift in job responsibilities may rise to the level of an adverse employment if the plaintiff demonstrates that the new duties entail a "dramatic downward shift in skill level"). Also, apart from the lack of evidence presented by Salmon, common sense does not compel the conclusion that, given Salmon's experience and credentials, teaching fourth or sixth graders is a demotion or any less challenging or requiring any less skill than her former combination of teaching fifth graders and seventh or eighth graders. *See Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F.Supp.2d 249, 264–65 (E.D.N.Y.1999) (finding that teacher's transfer from the first grade to the pre-kindergarten level was not an adverse employment action).

Any adult who has not learned to read likely would attest to the truth of the district court's holding in *Ticali* noting that the incremental nature of child development makes it difficult to characterize one grade as any more essential than another:

It is axiomatic that students cannot succeed in subsequent grade levels without first mastering the curriculum of the earlier grades. Pre-kindergarten students have important, if not sophisticated, lessons to learn ... Despite [plaintiff's] disdain for the pre-kindergarten position, she has provided no material evidence that her transfer obligated her to perform tasks that were less appropriate for her skills than her prior position or adverse to her in any other legally cognizable way.

*Id.*

On the other hand, some plaintiffs/teachers have brought discrimination claims against schools alleging that transfers from *lower to higher* grades represent adverse employment actions. *See, e.g., Johnson v. Chattanooga Bd. of Educ.*, No. 90–5593, 1991 WL 24709, at *2 (6th Cir. Feb.27, 1991) (finding that plaintiff failed to prove that her transfer from the second to the third grade was an adverse employment action; the plaintiff was "not entitled to employment at any particular school or in any particular capacity, so long as any transfer from where she was did not amount to a discharge or 'demotion' "). In the end, neither the facts nor the law save Salmon's retaliation claim where she utterly fails to adduce any evidence that her full-time assignment at Henryville Elementary School was an adverse employment action given her experience and previous responsibilities. Salmon's inability to demonstrate the adverse action element of her prima facie case simply provides another critical deficiency in her retaliation claim.[8]

---

8. The parties agree that our circuit has properly formulated and analyzed the elements of a prima facie retaliation claim under the ADA, and therefore the propriety of our circuit's approach is not before us. Yet, one commentator has suggested that the "materially adverse/adverse" action element constitutes an improper, judicially-imposed requirement on employment discrimination plaintiffs that the statute's language does not justify. *See* Ernest F. Lidge III, *The Meaning of Discrimination: Why Courts Have Erred in Requiring Employment Discrimination Plaintiffs to Prove That the Employer's Action Was Materially Adverse or Ultimate*, 47 U.Kan.L.Rev. 333, 336–39 n. 22 (1999) (contending that the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Circuits erroneously have created a substantive "adversity" requirement in compelling the plaintiff to prove that an employment action unfavorably affected the terms, condition or privileges of her employment). We leave that issue to another day.

Finally, Salmon fails to question the honesty of the School's non-retaliatory reasons for assigning her to Henryville Elementary, even assuming she could succeed in proving her prima facie case. As we recognized previously, the undisputed evidence demonstrates that the School reassigned Salmon's responsibilities in an attempt to accommodate her reported disability, and Salmon produces no evidence even remotely suggesting that the School's stated reason for reassigning her was either pretextual or retaliatory. Once the School investigated possible teaching assignments that did not involve Salmon's traveling, it located a vacancy at Henryville Elementary. Because the School was not obligated to create a position for Salmon, fiscal demands compelled it to select a reasonable accommodation that would avoid unnecessary spending. In other words, financial considerations complemented the School's search for an accommodation, and as long as an employer has a non-retaliatory reason for taking an adverse employment action, ADA liability does not attach. *See Russell*, 51 F.3d at 69–70. Despite Salmon's efforts to use the ADA as a vehicle to obtain the full-time junior high teaching assignment that she had unsuccessfully sought while *not* disabled, the evidence demonstrates that the School's accommodation remained true to the ADA's purpose of ensuring that disabled employees enjoy the same "equal employment opportunities" as non-disabled employees. 29 C.F.R. § 1630.19(a). Here, the School's non-retaliatory combination of reasons for assigning Salmon to Henryville Elementary remains unassailed, completely unaddressed by Salmon. Accordingly, we *GRANT* the School's mo-

tion for summary judgment on Salmon's retaliation claim.[9]

### Conclusion

For the reasons discussed, we *GRANT* the School's motion for summary judgment with respect to Salmon's reasonable accommodation claim under the ADA. We also *GRANT* the School's motion for summary judgment with respect to Salmon's retaliation claim under the ADA.

It is so ORDERED.

---

9. At one point in Salmon's Response, she states that it is not "completely correct" to characterize "this as a retaliation claim," although she then proceeds to apply the retaliation framework to this case. Pl.'s Resp. at 17. Instead, she contends without elaboration that "this is more correctly a 'discrimination' case," but she fails to identify or develop in her submissions another "discrimination" theory aside from her failure to accommodate and retaliation claims. *Id.* Also, her EEOC charge includes a failure to accommodate claim only. She never mentions some other form of a disparate treatment claim in her pleadings, for instance, although even if she had and properly included it within the scope of her EEOC charge, that claim would fail for many of the same reasons we have discussed regarding her retaliation claim, such as the School's articulation of a legitimate non-discriminatory reason for her transfer to Henryville Elementary.